Keating, J.
Samuel Lasky was for 18 years a patrolman in the New York City Police Department and for 12 years resided on the sixth and top floor of a Mount Yernon apartment house. At about one o’clock on the afternoon of July 10, 1964, Lasky stepped out of the shower and heard a noise at his front door. Before he could investigate, his phone rang and he answered it. After he completed the call, he went to the door and through the peephole he observed two men tiptoeing about the hallway. He went back to the telephone, called thé Mount Yernon police, dressed (not in uniform) and returned to the door where he observed the two men tiptoeing toward the stairway. Armed with his gun, he slammed his door and followed the footsteps he hoard running down the stairway.
Officer Lasky apprehended defendant — whom he did not recognize as being a tenant — between the fifth and fourth floors and asked him what he was doing in the building. Defendant claimed to be looking for a girl friend but refused to identify her because he said she was a married woman. Unimpressed with defendant’s apparent chivalry, Lasky brought him to the fourth floor and frisked him for a weapon by tapping his groin pockets and under his arms. He felt something hard which “ could have been a knife ” and from the right pants pocket he withdrew an unsealed opaque plastic envelope. Upon examination the envelope was found to contain six picks, two Allen wrenches with the short leg of each filed down to a screwdriver edge and a tension bar. These, from his 18 years’ experience, Lasky instantly recognized as burglar’s tools. Lasky then went back to the sixth floor doorway from which defendant had come but was satisfied that the two men had not gotten in. He took defendant down to the manager’s office and turned him and the envelope over to Mount Yernon police.
*242 Defendant’s motions to suppress the evidence and to dismiss liis indictment for unlawful possession of burglar’s tools were denied. He was then convicted upon his plea of guilty.
On this appeal defendant contends that the evidence of the tools was the result of an unlawful search and seizure and was inadmissible. Specifically, he argues that (1) the rationale of People v. Rivera (14 N Y 2d 441) is inapplicable and (2) section 180-a of the Code of Criminal Procedure, if applicable, is unconstitutional.
Though Rivera (supra) was decided after the passage of section 180-a, the statute was not in effect at the time the events took place. We hold that the rationale of Rivera is applicable to the instant case so that, even without the aid of the statute, the seizure of the burglar’s tools was legal.
In Rivera we divided the problem into two stages: the legality of the detention and the legality of the frisk. With regard to the former, we noted (p. 444) that it is the business of police to prevent crime and that prompt inquiry into “ suspicious or unusual street action ” is an indispensable police power “ And the evidence needed to make the inquiry is not of the same degree or conclusiveness as that required for an arrest. The stopping of the individual to inquire is not an arrest and the ground upon which the police may make the inquiry may be less incriminating than the ground for an arrest for a crime known to have been committed ” (p. 445).
The suspicious circumstances in this case warranted Officer Lasky’s stopping defendant and inquiring as to his presence in the building. Though Rivera happenedin the streets”, the power of inquiry is not limited to the streets. It is the reasonableness of the officer’s suspicion which is determinative and the place where the events transpire is only one factor in weighing this suspicion.
In the instant case Lasky twice observed two men, whom, as a 12-year resident, he did not recognize as belonging in the building, tiptoeing around the top floor of an apartment house. When his door slammed, they hastily exited by the stairway, not the elevator.
Such circumstances are reasonably suspicious and the common law has long recognized the right of law officers in such a *243 situation to make the limited intrusion of asking one for an. explanation of Ms actions (see citations in Rivera, supra, p. 446). In detaining defendant, Lasky was performing his duty and exercising a reasonable and necessary police power for the prevention of crime and the preservation of the public order. As the trial court noted, an off-duty policeman is not relieved of his obligation to preserve the peace or protect the lives and property of citizens. The acceptance of this duty has been demonstrated on numerous occasions when such officers have risked and sacrificed their lives to frustrate the commission of crime or to bring the perpetrator of crime to justice.
The second question in Rivera was whether the police could properly frisk defendant and seize something, the possession of which constituted a crime. Since the limited detention for the purposes of inquiry was found to be a necessary adjunct to the prevention and discovery of crime, we further recognized that the answer to such an inquiry might be a bullet — in any event the exposure to danger could be very great. The frisk is a reasonable and constitutionally permissible precaution to minimize that danger. Since the frisk was held to be legal, the seizure of the evidence of a crime which was thereby discovered was also legal and the motion to suppress should have been denied.
It is well-recognized that the basis for a frisk is the concern for the well-being of the officer. Officer Lasky was in at least as dangerous a situation as was the officer who arrested Rivera, and probably more so. In Rivera, though it was nighttime, there were three policemen present and only two suspects and the frisking took place on a wide street. In this case a single officer collared a single defendant in the narrow confines of a stairway. Moreover, there was a second suspect still on the loose, perhaps still in the stairway. In such a situation the tables are easily turned, especially if the suspect possesses a dangerous weapon. Not only was Lasky’s frisk legal, it was necessary — it would have been extremely poor police work not to have frisked the defendant in such a situation.
The fact that the frisk produced an envelope containing burglar’s tools rather than a knife is not determinative. As we said in Rivera, “ The fact that the police detective actually found a gun in defendant’s possession is neither decisive nor material to *244 the constitutional point in issue. The question is not what was ultimately found, but whether there was a right to find anything” (p. 447).
Lasky was in a potentially dangerous situation wherein a frisk was warranted. Touching an object which may have been a knife he was just as warranted in removing it as was the officer who removed Rivera’s gun. Holding the unsealed envelope, Lasky was warranted in examining it for a knife just as he would be warranted in opening a holster to see if it had a gun. Once he saw the tools, he had probable cause for arrest and was obviously entitled to seize them, as did the officer who seized Rivera’s gun. Thus this case is wholly within the limits of Rivera and is a reasonable exercise of police power.
Turning next to section 180-a, it is apparent that there is not a great deal of difference between the statute and the standards used in Rivera. It is also apparent that the statute is applicable to the present facts. The hallways and stairways of large multiple dwellings, where delivery men, service men, visitors and other strangers are continually moving, must be considered public places within the statute. This is as it should be, considering the alarming number of elevator muggings, courtyard attacks and “ second story ” burglaries.
The statute makes it clear that the Legislature did not intend the stopping and frisking to be an arrest. Nor, as we pointed out in Rivera, does the intrinsic nature of the activity make it an arrest. Detention for a short and reasonable period in order to question is not an arrest, and such a right of inquiry was rooted in early English practice and approved by the common-law courts and commentators. (United States v. Vita, 294 F. 2d 524, 530.) As Lumbard, C. J., noted in Vita, the line between detention and arrest is a thin one but a necessary one if there is to be any effective enforcement of the criminal law. For it not only aids the police but also protects those who are readily able to exculpate themselves from being arrested and having charges preferred against them before their explanations are considered.
Of course there must be an adequately defined standard for the authorization of the detention and the Legislature has provided one. The phrase “reasonable suspicion” provides a defined standard and is, in fact, no less endowed with an objective meaning than is the phrase “ probable cause.” Courts will *245 have no difficulty in applying this standard and have frequently in the past referred to “ suspicion ” or “ reasonable suspicion ” as terms with a definite meaning, somewhat below probable cause on the scale of absolute knowledge of criminal activity.
Not only are we satisfied that “ reasonable suspicion ” is an adequate standard, we are also satisfied that the actions which it authorizes are constitutionally reasonable. For in the last analysis the constitutionality of the statute is determined not so much by the language employed as by the conduct it authorizes. The conflict between the desire to be free from any police detention and the long-recognized need for police inquiry must be resolved by striking a fair balance. By requiring the reasonable suspicion of a police officer, the statute incorporates the experienced police officer’s intuitive knowledge and appraisal of the appearances of criminal activity. His evaluation of the various factors involved insures a protective, as well as definitive, standard.
In addition to the detention which is authorized, the officer is allowed to frisk the suspect if he reasonably suspects that he is in danger of life or limb. Again the standard is the reasonable suspicion of the officer. The frisk, as it was described in this case and as it is generally understood, involves the patting of the exterior of one’s clothing in order to detect by touch the presence of a concealed weapon. In Rivera, we went to some length to distinguish a frisk from a full search: “ It is something of an invasion of privacy; but so is the stopping of the person on the street in the first place something of an invasion of privacy. The frisk is less such invasion in degree than an initial full search of the person would be. It ought to be distinguishable also on pragmatic grounds from the degree of constitutional protection that would surround, a full-blown search of the person ” (p. 446).
The frisk is necessary on grounds of elemental safety. Even when the police officer has the upper hand, the tables are easily turned. The policeman should not be forced to deal with the possibility of a suspect’s going for a concealed weapon where he reasonably suspects the presence of such weapon. In this case Lasky was not trying to intimidate defendant nor was he merely trying to be a hero. He was acting, if not beyond the call of duty, at least on the fringe of duty. Before going after defendant he phoned the local police.
*246 This officer is deserving of onr highest praise. The Legislature has determined that such acts by police officers should not be discouraged by unnecessarily exposing them to the dangers of concealed weapons. Since a frisk is necessary to remove this danger and since it is less of an invasion than a full search, it is just that such a frisk may be warranted upon grounds which would not sustain a full search — i.e., grounds less than probable cause.
If, as in this case, the frisk discloses something, other than a weapon, the possession of which is a crime, the statute requires the officer to return it or make an arrest. As long as the detention was proper and the frisk did not exceed its necessary and normal bounds, there is no reason to deny to the police the use of this evidence. If an arrest is to be made, the protective standard of reasonable cause must be met.
Thus, the effect of the statute is to set standards which will govern the police power of limited detention and the limited search known as a frisk. Where a person’s activities are perfectly normal, he is fully protected from any detention or search. Where a person’s activities, together with facts and circumstances of which a police officer has reasonably trustworthy information, are sufficient' to warrant a reasonably cautious officer to suspect the person of committing or being about to commit certain crimes, that person may be detained and asked for his name, address and an explanation of his activities. Where such a person has been detained and the facts and circumstances warrant the reasonable officer in suspecting that he is in danger of life or limb, the person may be searched for a dangerous weapon in the least obtrusive manner. Finally, where a person’s activities and the facts and circumstances of which the police have reasonably trustworthy information are sufficient to warrant an officer of reasonable caution to believe that a crime is being or was committed, the police may arrest and fully search such a person.
Stripped to the barest essentials, “ probable cause ” requires satisfactory grounds for believing that a crime was committed, while “reasonable suspicion” requires satisfactory grounds for suspecting that a crime was committed. The difference between these two standards is proportionate to the difference in degree of invasion between an arrest and a detention, between *247 a full search and a frisk. Such a difference in standards is both reasonable and desirable.
The attempt to apply a single standard of probable cause to all interferences — i.e., to treat a stop as an arrest and a frisk as a search — produces a standard-either so strict that reasonable and necessary police work becomes unlawful or so diluted that the individual is not adequately -protected. The varying standards now in effect through our decision in Rivera and through section 180-a best resolve this problem.
The Fourth Amendment protects not against all searches and seizures but “against unreasonable searches and seizures”. The doctrine of “stop and frisk upon reasonable suspicion” does not produce unreasonable searches and seizures. It gives effect to the principle that the grounds for a stop should be reasonable in light of the degree of interference it represents.
In the recent case of Ker v. California, eight Justices agreed on that part of the opinion which stated: “ The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet ' the practical demands of effective criminal investigation and law enforcement ’ in the States, provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain ” (374 U. S. 23, 34).*
By judicial action in Rivera and legislative action in section 180-a, our State has developed a reasonable and workable set of rules governing arrest, search and seizure. These rules are similar to those adopted in several other States, notably California whose criminal problems in large urban areas are similar to ours. (See People v. Martin, 46 Cal. 2d 106; also Kavanagh v. Stenhouse, 93 R. I. 252, and Commonwealth v. Lehan, 347 Mass. 197.) Under these rules Officer Lasky properly executed his duties as a police officer and the motion to suppress was properly denied.
The judgment of the Appellate Division should be affirmed.

 The ninth, Justice HARLAN, favored an even sharper demarcation between Federal searches and seizures and State searches and seizures, thus giving the States still greater leeway to determine 'he needs of their law enforcement agencies.