## DIXON *v.* SHINER.

OPINION OF THE COURT.

1. APPEAL AND ERROR—THEORY OF DEFENSE—FALSE IMPRISONMENT.
   Persons who defend an action against them for false imprisonment and false arrest in the trial court on the theory that the arrest was proper will not be heard to argue for the first time on appeal that there was in fact no arrest.

2. WORDS AND PHRASES—ARREST.
   An arrest is the seizing or detaining of the person of another by any act which indicates an intent to take him into custody and subjects the person arrested to the actual control of the person making the arrest.

3. ARREST—ELEMENTS.
   Finding by trial court that plaintiff was arrested when he was stopped by policemen, asked to identify himself, "patted down", and asked other questions *held,* supported by the record even though plaintiff was never actually told that he was under arrest.

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 546.
[2, 3, 6, 8] 5 Am Jur 2d, Arrest § 1.
[4] 5 Am Jur 2d, Appeal and Error § 839 *et seq.*
[5, 9, 10] 5 Am Jur 2d, Arrest § 44 *et seq.*
[7] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*

4. APPEAL AND ERROR—FINDINGS OF FACT.
    Findings of the trial court will be left undisturbed unless they
        are clearly erroneous (GCR 1963, 517.1).

5. ARREST—WITHOUT WARRANT—PROBABLE CAUSE.
    An arrest without a warrant for a felony is not justified unless
        probable cause for the arrest existed at the time of the arrest,
        and nothing happening after the arrest can give legality to a
        previously illegal arrest.

DISSENTING OPINION.

LEVIN, J.

6. ARREST—DEFINITION—WORDS AND PHRASES.
    *The term "arrest" can no longer be used to cover both a stopping
        for a so-called field interrogation and a taking into custody in
        light of recent court decisions upholding "stop and frisk".*

7. SAME—FALSE ARREST—APPEAL AND ERROR—PRESERVING QUES-
    TION.
    *Defendant police officers, in action for false arrest, are not pre-
        cluded from appealing trial judge's finding that their initial
        stopping and interrogation of plaintiff was unlawful on ground
        that they failed to preserve the question for review, where the
        plaintiff in his complaint charged that defendants unlawfully
        arrested him and defendants admitted the arrest but asserted
        that it was lawful and then at trial plaintiff asserted that not
        only was the formal, admitted arrest unlawful, but that the
        initial stopping and interrogation was unlawful, and trial judge
        found for plaintiff on the latter contention.*

8. SAME—ACTIONS CONSTITUTING ARREST—TESTIMONY—EFFECT.
    *Layman's characterization of the stopping of a person by a po-
        liceman for field interrogation as constituting or not constitut-
        ing an arrest does not amount to a binding admission in an
        action for false arrest; the question is one of law for the court.*

9. SAME—PROBABLE CAUSE—STOP AND FRISK.
    *Holding of United States Supreme Court that it is not always
        constitutionally unreasonable for a policeman to seize a per-
        son and subject him to a limited search for weapons, even
        though there is not probable cause for an arrest, decided only
        a Federal constitutional question, and State courts are still free
        to decide as a matter of local law to what extent they wish to
        permit a reasonable search and seizure short of formal arrest
        as long as the standards of reasonableness are no less restrictive
        than the Federal standards.*

10. Same—False Arrest—Stopping—Fact Finding.

> The Court of Appeals should determine the meritorious question
> of law presented in an action for false arrest, namely, whether
> a stopping and questioning of plaintiff by defendant police
> officers, who had at the time no probable cause for an arrest,
> necessarily constituted an arrest and was therefore a false
> arrest.

Appeal from Wayne, Kaufman (Charles), J. Submitted Division 1 January 5, 1967, at Detroit. (Docket No. 1,385.)   Decided July 31, 1968.

Declaration by Sandy Dixon, Jr., against Ronald Shiner and William Schmidt for false imprisonment. Verdict and judgment for plaintiff. Defendants appeal. Affirmed.

*Heading, Williams, Fonville & Floyd,* for plaintiff.

*Robert Reese,* Corporation Counsel for the City of Detroit, and *William P. Doran* and *John E. Cross,* Assistants Corporation Counsel, for defendants.

Lesinski, C. J.   This suit for false imprisonment or illegal arrest was brought by plaintiff, Sandy Dixon, Jr., against defendants, Ronald Shiner and William Schmidt, who are police officers for the city of Detroit.   From a judgment granted in favor of plaintiff by the Wayne county circuit court sitting without a jury, defendants appeal.

The gravamen of the complaint set forth that on June 3, 1962, defendants, while on duty as police officers for the city of Detroit, did arrest and detain plaintiff without a warrant and without probable cause.   The defendants in their answer deny that the arrest was unlawful and affirmatively state that

the arrest was lawful and based upon a reasonable belief that the plaintiff had committed a felony; to wit: breaking and entering a dwelling in the nighttime.[1]

The pretrial statement signed by the circuit judge gives the parties' respective versions of the case:

*"Plaintiff's version:* Plaintiff contends that while a peaceful pedestrian on E. Jefferson Avenue, on June 3, 1962, the defendants, by exercise of force and threats, did wrongfully place the plaintiff under arrest without a proper warrant or proper authority for said detention.

*"Defendants' version:* Defendants contend that the arrest was lawful in that there was probable cause for them to believe that a felony was being or had been committed, and that the plaintiff was involved in same. Defendants further deny that they committed any assault or used any force or violence upon the plaintiff, and, further, contend that their actions with respect to the plaintiff were lawful, and that they were at all times in the good faith of the performance of their duty as police officers."

The trial disclosed the following events on the night in question.

Officers Ronald Shiner and William Schmidt were plainclothes detectives assigned to the 5th precinct "B & E" car. The purpose of the "B & E" car is to provide extra protection in high crime neighborhoods. Officers assigned to this duty specialize in the detection of such crimes as breaking and entering businesses and dwellings, purse snatchings, robbery armed, and narcotics.

Defendants worked the shift starting from 8 p.m. on June 2 to 4 a.m. on the morning of June 3, 1962.

---

[1] CL 1948, § 750.110 (Stat Ann 1962 Rev § 28.305), amended after this incident by PA 1964, No 133.

Before going on duty, the officers were instructed to give special attention to the Bali-Hi Motel located on the northeast corner of Jefferson and St. Clair because during the previous week a robbery had been committed there.

At approximately 3:45 on Sunday morning, June 3, 1962, these two officers were patrolling in an easterly direction on Jefferson and observed a man, later identified as Sandy Dixon, for about 5 minutes walking back and forth on the public sidewalk in front of the office of the Bali-Hi Motel. The officers, after deciding to question the man, pulled up next to him and got out of the car. In response to questions by the officers, the man presented identification that he was Sandy Dixon and also a car registration to a 1960 Pontiac car parked nearby on St. Clair street just north of Jefferson avenue. Mr. Dixon was then "patted down" by the officers. In response to further interrogation by the officers, Mr. Dixon stated that he had come to pick up a friend by the name of Dan Smith. Dan Smith's testimony corroborated plaintiff's story.

During the course of the interrogation but *after* Mr. Dixon had been searched or "patted down," the officers noticed a soldier coming from the motel with some luggage. The soldier did not come out to the sidewalk where the officers and Mr. Dixon were standing, but instead turned and walked across the lawn and through the shrubbery to the car that Dixon had identified as belonging to him. The soldier then began putting the luggage into the car.

Officer Schmidt thereupon proceeded to walk over to the automobile to question the soldier. When patrolman Schmidt asked the soldier what he was doing, the soldier stated he was putting the luggage in his friend's car and pointed to Dixon. The soldier, while talking with the officer, dropped a key to the ground which was picked up by officer Schmidt.

The key was to room 17 of the Bali-Hi Motel. Officer Schmidt, leaving Dixon and the soldier with his partner, went to the motel to interrogate the night manager. The manager reported that room 17 was registered to two men from Cincinnati, Ohio, neither of whom was Dixon or the soldier. Officer Schmidt then returned to the car to inform Dixon and the soldier that they were under arrest for breaking and entering an apartment. Despite Dixon's claim that he did not know the soldier, he was handcuffed and taken along with the soldier to the 5th precinct station. It was subsequently determined that the luggage was stolen. Dixon was released from custody on Sunday about 11 a.m. It does not appear that criminal proceedings have been taken against him.

The record discloses that Dixon is a schoolteacher and an ordained minister holding a bachelor's degree from the University of Detroit and a master's degree from Michigan State University.

Defendants contend on appeal that the trial court erred in its ruling that plaintiff was technically under arrest when first detained by the officers. The trial court ruled: "When the plaintiff was first detained * * * there was no indication whatsoever that there was a crime being committed, and that this particular plaintiff had any connection with any crime which was being or had been committed. * * * Subsequent events cannot justify a false arrest."

It is now contended by the defense that plaintiff was not placed under arrest until after certain crucial events had taken place, i. e., the officers' apprehension of a soldier who had come from the Bali-Hi Motel, while putting luggage in the plaintiff's car, and the motel manager's statement that neither Dixon nor the soldier were registrants of the motel. The defense thus argues that prior to the occurrence

of these crucial events, plaintiff was under reasonable detention and not under arrest, for the purpose of establishing his identity and reason for being around a motel at 3:45 a.m. The defense admits that the officers did not have probable cause to make an arrest without a warrant when plaintiff was initially detained, but nonetheless contends that such detention does not constitute an arrest and the validity of the detention does not depend on the presence of "probable cause."

Defendants have called to our attention a number of cases from other jurisdictions holding that police officers may "stop and frisk" persons on the street and reasonably detain them to establish their identity and purpose, notwithstanding the absence of probable cause to make a valid arrest. *People* v. *Entrialgo* (1963), 19 App Div 2d 509 (245 NYS2d 850), aff'd (1964), 14 NY2d 733 (250 NYS2d 293, 199 NE2d 384); *People* v. *Rivera* (1964), 14 NY2d 441 (201 NE2d 32, 252 NYS2d 458) cert denied (1965) 379 US 978 (85 S Ct 679, 13 L Ed 2d 568); *United States* v. *Vita* (CA 2, 1961), 294 F2d 524; *People* v. *Amos* (1961), 190 Cal App 2d 384 (11 Cal Rptr 834). See, also, *United States* v. *Thomas* (SD NY, 1966), 250 F Supp 771.

The United States Supreme Court recently, in *Sibron* v. *New York* (and *Peters* v. *New York*) (1968), 392 US 40 (88 S Ct 1889, 20 L Ed 2d 917), and *Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868, 20 L Ed 2d 889), sustained the constitutionality of "stop and frisk." The defendants erroneously urge that the issue of "stop and frisk" is involved in this cause. In the instant case the pleadings, pretrial statement,[2] and trial all point to one issue: whether the officers had probable cause to arrest plaintiff

---

[2] See summary of pleadings and defendants' version of the case on pages 575, 576, ante.

when he was initially detained by them. Although there was some testimony which would support defendants' contention, it is patently clear from the brief opening statement of defense counsel, made after plaintiff had rested his case, that "probable cause" was the only material issue before the court:

"May it please the Court, it occurs to me that it is clear at this juncture that the question of material importance in this case is whether or not the arrest on June 3, 1962, was based upon reasonable cause to believe that a felony had been or was being committed and that Mr. Dixon was involved in the commission of that felony. I suggest that without further statement that we likewise will proceed with our witnesses."

Although the record before us clearly demonstrates that the theory of the defense below was that the initial detention of plaintiff was justified in that probable cause existed to make a valid arrest, a different theory is offered to avoid liability on appeal. The law in this state affords a review of the theory tried below and defendants will not be permitted to argue another theory on appeal to avoid liability. *Lash* v. *Prokop* (1951), 331 Mich 390; *Brackins* v. *Olympia, Inc.* (1946), 316 Mich 275; *Charles Ruppel* v. *The Adrian Furniture Manufacturing Company* (1893), 96 Mich 455.

Although we feel that what has been said heretofore is sufficient to determine this appeal, certain testimony warrants additional comment. Officer Shiner testified that Mr. Dixon was not placed under arrest until "Patrolman William Schmidt returned from the [motel] manager's office."

The following excerpt from testimony by officers Shiner and Schmidt elicited on cross-examination by plaintiff's counsel, conflicts with the above testimony that Mr. Dixon was not placed under arrest

until after the occurrence of certain noted crucial events:

Cross-examination of officer Shiner:

"*Q.* You arrested him when you first stopped him, did you not?
"*A.* Yes, we did.

"*Q.* At that time did you see him commit any crime in your presence?
"*A.* No, we did not.

"*Q.* Did you have a warrant for his arrest at that time?
"*A.* No.

"*Q.* Your statement is that when you first stopped him he was not committing any crime, nor did you have a warrant for his arrest?
"*A.* No.

"*Q.* *You didn't have any knowledge of any crime at the time you stopped him, first stopped him?*
"*A.* No, we did not.

"*Q.* But he was arrested at that point on the sidewalk, on the street?
"*A.* Yes.

"*Q.* *He was not committing a crime, you didn't have a warrant or knowledge of any crime?*
"*A.* *No, we did not.*

"*Q.* Did you ever search Mr. Dixon?
"*A.* Yes, we did."   (Emphasis supplied.)

Cross-examination of officer Schmidt:

"*Q.* Mr. Schmidt, when did you first stop Mr. Dixon?

\*     \*     \*

"*A.* In front of the office, beside the office of the Bali-Hi Motel.
"*Q.* Did you identify yourself as a police officer?
"*A.* Yes, sir.
"*Q.* *He was then and there under arrest?*
"*A.* *Technically he was.*

"*Q.* Was he committing a crime in your presence at the time you arrested him?

"*A.* No.

"*Q.* Did you have a warrant for his arrest?

"*A.* I did not.

"*Q.* Did you have knowledge that he was wanted for any crime at that time?

"*A.* Himself?

"*Q.* Yes?

"*A.* No, I did not.

"*Q. But you proceeded to arrest him anyway, is that right?*

"*A.* Yes.

"*Q.* Notwithstanding the fact that he wasn't committing a misdemeanor or a felony, you arrested him anyway?

"*A.* You mean like detaining someone?

"*Q. Did you arrest him or didn't you?*

"*A. Yes, as soon as he stopped.*

"*Q.* At that time you had no knowledge of any crime, as a matter of fact?

"*A.* That's right." (Emphasis supplied.)

*People* v. *Gonzales* (1959), 356 Mich 247, 253, citing from 4 Am Jur, Arrest, § 2, defines "arrest" as follows:

" 'An arrest is the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest. The act relied upon as constituting an arrest must have been performed with the intent to effect an arrest and must have been so understood by the party arrested.' "

Applying this definition to the instant case, the court could properly find that when the police officers stopped, detained, interrogated and searched Mr. Dixon, the latter had been effectively placed under arrest.

Such a view was expressed by the United States Supreme Court in *Henry* v. *United States* (1959), 361 US 98 (80 S Ct 168, 4 L Ed 2d 134). In this case federal officers had received information of an undisclosed nature implicating defendant in a theft from an interstate shipment of whiskey. The day after this theft the officers observed the defendant and another leave a tavern and drive to an alley in a residential area where certain cartons were put in the car. Defendants drove back to the tavern and later returned to the same place loading additional cartons in the car. When the car drove away, the agents followed and waved it to stop. The officers got out of their car and searched the car, seizing certain cartons therein which were subsequently determined to contain stolen radios. In respect to when the arrest took place, Justice Douglas, speaking for the Court, stated (361 US 103, 80 S Ct 171, 4 L Ed 2d 139):

"[T]he arrest took place when the federal agents stopped the car. That is our view on the facts of this particular case. When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete. It is, therefore, necessary to determine whether at or before that time they had reasonable cause to believe that a crime had been committed. The fact that afterwards contraband was discovered is not enough. An arrest is not justified by what the subsequent search discloses."

The determination of when the arrest occurred is for the trier of fact and "depends upon an evaluation of the conflicting testimony of those who were there that night." *Rios* v. *United States* (1960), 364 US 253, 262 (80 S Ct 1431, 1437; 4 L Ed 2d 1688, 1694).

This record shows ample evidence to support a finding by the trial judge that Dixon had been "arrested" when he was detained, interrogated and "patted down" by the police officers, notwithstanding the fact that the officers did not tell him he was under arrest until later. Such a finding not being clearly erroneous will be left undisturbed by this Court. GCR 1963, 517.1.

An arrest for a felony without a warrant is not justified unless probable cause therefor existed at the time of the arrest. *People* v. *Harper* (1962), 365 Mich 494; *certiorari denied* 371 US 930 (83 S Ct 302, 9 L Ed 2d 237). As conceded on appeal by defendants and revealed by this record, there was no probable cause to arrest Dixon when he was detained, interrogated and searched by the police officers.

If, therefore, the arrest occurred prior to the time the soldier began loading luggage into Dixon's car, as determined by the trial court, then nothing occurring thereafter could make the arrest lawful. *Henry* v. *United States, supra; Rios* v. *United States, supra.*

Judgment affirmed. Costs to appellee.

HOLBROOK, J., concurred with LESINSKI, C. J.

LEVIN, J. (*dissenting*). Plaintiff Sandy Dixon, Jr. was stopped, frisked, and questioned by 2 police officers, the defendants Ronald Shiner and William Schmidt. Dixon answered their questions and was frisked, which was described by one of the officers as a light patting down. Neither before nor upon conclusion of such questioning was there reasonable cause to believe a felony had been committed, let alone reasonable cause to believe Dixon had committed a felony and, thus, the police officers, not hav-

ing obtained a warrant for Dixon's arrest, were without authority to arrest him.[1]

However, before either Dixon or the police officers had left the scene, events developed in such a way that the police officers did then have both reasonable cause to believe a felony had been committed and reasonable cause to believe Dixon had participated in its commission. (See footnote 6) Thereupon the police officers arrested Dixon. He was detained some 7 hours and then released without charge. He was, apparently, innocent of the crime which prompted his arrest.

Dixon brought this action against the police officers charging he was unlawfully arrested. The trial judge, sitting without a jury, found that the initial stop, frisk and on-street questioning was an arrest and that, since the arrest was made at a time when there was not reasonable cause to believe a felony had been committed, in the commission of which Dixon had participated, the arrest was an unlawful arrest. The trial judge awarded Dixon $500 damages.

The police officers appeal, claiming the initial stop, frisk and on-street questioning was not an arrest. The majority refuse to consider that issue on its merits saying that to do so would be to permit the police officers to argue on appeal a theory not presented below. There is no factual basis for the majority's premise other than the blurred meaning of the word "arrest", for which definitional obscurity neither the police officers nor their counsel are responsible.

The source of the difficulty is that it once was commonplace to declare, but perhaps not to hold, that

---

[1] "Any police officer may, without a warrant, arrest a person * * *.
"(d) when he has reasonable cause to believe that a felony has been committed and reasonable cause to believe that such person has committed it." CL 1948, § 764.15 (Stat Ann 1954 Rev § 28.874).

even a brief detention, especially by a police officer, is an arrest.[2] More recently, as the propriety of stop and frisk came to be debated and litigated, it was sought to establish a distinction between an investigative stop and a taking into custody or formal arrest, it being asserted by proponents of stop and frisk that, while probable cause is required for an arrest, something less suffices for a stop and frisk. While the United States Supreme Court declined in the stop and frisk cases[3] to distinguish between a stop and an arrest as such and declared both covered by the Fourth Amendment and the exclusionary rule devised for its protection, it is clear that the Court has recognized a distinction between a formal or technical arrest, requiring probable cause, and an intrusion or stopping falling short of formal arrest which the Court has now declared does not violate the Fourth Amendment if the exigencies of the situation do not allow adequate time for the police officer to obtain a warrant and he is able "to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant"[4] the intrusion on the citizen's privacy.

The United States Supreme Court had no need to redefine "arrest" in order to decide the stop and frisk cases. In those cases the question was not whether there had been an arrest, but whether limited seizures and searches of the kind described were protected by the Fourth Amendment as applied to

---

[2] 5 Am Jur 2d, Arrest, § 1. Compare, Restatement, Second, Torts, § 112, which defines "arrest" as follows:

"An arrest is the taking of another into the custody of the actor for the actual or purported purpose of bringing the other before a court, or of otherwise securing the administration of the law."

See, also, State and lower Federal court cases cited in footnote 7.

[3] *Terry* v. *Ohio* (1968), 392 US 1 (88 S Ct 1868, 20 L Ed 2d 889), and *Sibron* v. *New York* (1968), 392 US 40 (88 S Ct 1889, 20 L Ed 2d 917).

[4] *Terry* v. *Ohio, supra*, p 21.

the States through the Fourteenth Amendment which protects the people "against unreasonable searches and seizures." The reluctance of the United States Supreme Court to redefine the term "arrest" lest some assume an intrusion or stopping short of arrest is no longer constitutionally protected, does not change the need in light of its ruling for a redefinition of terms. We can no longer use one term "arrest" to cover both a stopping for so-called field interrogation and a taking into custody. Until better terminology is coined, the terms "stop" and "formal arrest" are needed to make clear what we are talking about; to distinguish, if you like, between one kind of "arrest" and another, and to avoid precisely the kind of definitional difficulty which led the majority to conclude that the issue the police officers seek to raise on this appeal has not been properly preserved.

## I.

The plaintiff Dixon had the burden of declaring the issues in this action. It was Dixon, not the police officers, who failed to state whether the police officers were charged with the tort of unlawful arrest on the basis of what occurred at the time he initially was stopped or on the basis of what occurred at the time he was taken into custody. Dixon's declaration and his "plaintiff's version" in the pre-trial statement[5] charged the police officers

---

[5] (a) *Declaration.* The declaration charged the defendants "did arrest plaintiff and by exercise of force and threats compel plaintiff to accompany them, and the said defendants, to the city of Detroit police precinct number 5, under pretense that the said plaintiff was sought for the commission of a crime." Later: Defendants "did maliciously and without reasonable or probable cause whatsoever arrest and imprison plaintiff for a long space of time." Surely the police officers were not obliged to conclude, indeed cannot be expected to have concluded, that Dixon's declaration complained of the initial stop rather than the formal arrest.

with an unlawful "arrest" without specifying whether the claim was that the initial stop or the subsequent formal arrest was the allegedly unlawful arrest.

It is apparent from an examination of the trial transcript that Dixon's proofs primarily challenged the formal arrest, the taking into custody and only incidentally, if at all, focused on the initial stopping as a separate, identifiable wrong with legal consequences for the purposes of this action separate and apart from the formal arrest itself. Since Dixon's proofs challenged the taking into custody, it is understandable that defense counsel in his opening statement (referred to in the majority opinion) responded by saying the taking into custody, or formal arrest, was validated by probable cause, as it in fact was.

---

(b) *Answer.* The police officers denied Dixon's allegations, adding the arrest was a lawful arrest, relying on their *statutory* authority to arrest. That response, read in the light of Dixon's declaration, could not be understood as a concession that the initial stop was an unlawful arrest or a claim that there was probable cause to make an arrest at the time of the initial stop.

(c) *Pretrial statement.* Dixon's version was that the police officers wrongly placed him "under arrest." The police officers' version was that the "arrest" was lawful in that there was probable cause for them to believe a felony was being or had been committed and Dixon was involved in committing it. It is now apparent that the pretrial statement failed in its purpose in that it did not summarize with specificity the factual and legal issues to be litigated (GCR 1963, 301); the pretrial statement did not specify whether the allegedly unlawful arrest was the stop or the taking into custody, or both. But the failure of Dixon's version and of the police officers' response to serve this purpose cannot be charged to the police officers who were required to respond only to that which Dixon claimed; and all he claimed was that he was unlawfully "arrested". The police officers were not required to do more than state their denial.

One can hardly blame the police officers' counsel for failing to clear up the ambiguity regarding the precise nature of Dixon's claim. For all defense counsel knew, for all that appears from the declaration and Dixon's version in the pretrial statement, all that Dixon intended to claim at trial was that the formal arrest was without reasonable cause; on the record so far *then* made, one cannot say such an interpretation was unreasonable. It was not the obligation of the police officers' counsel to educate Dixon's counsel concerning any deficiencies in his pleadings; it was not their obligation to highlight the feature of Dixon's case on which he should concentrate.

It was not until the defendants started to put in their defense and Dixon's counsel had an opportunity to cross-examine officer Shiner that, for the first time in the entire action, Dixon focused on the stopping phase as a separable phase. What would the majority require defendants' counsel to have affirmatively done at that juncture to preserve their right of appeal? Surely, it was not necessary for defendants' counsel to have sought leave to amend the defendants' answer to assert that the initial stop, frisk and on-street questioning was not an arrest despite the fact Dixon's counsel had not yet amended Dixon's declaration to state that the initial stop, frisk and on-street questioning was an arrest.

If, as the majority postulate, the police officers had contended they had probable cause to arrest Dixon when they first stopped and frisked him and commenced their on-street questioning, and the whole case had been tried on that issue, *i.e.,* whether there was probable cause to "arrest" Dixon at *that* time, then possibly the officers should be precluded from asserting for the first time on appeal that they had the right to stop, frisk and question Dixon without regard to whether they had probable cause to do so. However, there is *nothing* in the record which would support the majority's conclusion that the police officers ever claimed, before or at trial, to have had probable cause to arrest Dixon when they commenced their on-street questioning.

Although the majority hold the police officers failed properly to preserve for review by us the meritorious questions, they emphasize the testimony of the police officers on cross-examination to the effect that Dixon was under arrest when he was first stopped. It is not claimed that Dixon was then told he was under arrest; on the contrary, the record shows he was not told he was under arrest until the

formal arrest at which time there was probable cause to arrest him.

The difference of opinion among legal scholars and the courts as to what constitutes an arrest or an unlawful arrest makes it apparent that a layman's interpretation should not control our decision even if that layman be one of the parties involved. No doubt, police officers have been instructed that any stopping or detention can or may be regarded as an arrest. When one of the police officers in this case responded on cross-examination: "Yes, he [Dixon] was technically under arrest", he was merely repeating that view of the law.

The police officers are no more bound by their at-time-of-trial legal characterization of what occurred than Dixon is bound by his at-time-of-trial legal characterization. Dixon testified he was arrested *after* the appearance of the Canadian soldier and the return of one of the police officers from the motel manager's office, whereupon, testified Dixon, he was arrested at St. Clair and Jefferson where his car was parked, a short distance from where he was initially stopped.[6]

---

[6] Dixon told the police officers he arrived at the motel in an automobile then parked on St. Clair north of Jefferson, and that he was waiting for a friend. Within a few minutes and while the officers were still at the scene, an individual dressed in the uniform of a Canadian soldier emerged from the motel carrying luggage heading for Dixon's car. He entered Dixon's car and when questioned by the police officers declared that Dixon had driven him to the motel. Dixon was asked to accompany the officers to the car. It appears from his testimony he had no objection to doing so, which is not surprising since he must at that juncture have regarded it most fortunate the police officers were on the scene to remove this stranger who had just entered his automobile at 4:00 a.m.

A series of events then occurred which led to Dixon's formal and most unfortunate arrest. The Canadian soldier dropped a key to a motel room which he studiously avoided picking up. One of the officers checked with the motel manager and learned that the room for that key was registered to neither Dixon nor the Canadian soldier, following which Dixon and the soldier were formally arrested.

## II.

The question presented is whether the stopping, frisking and questioning of the plaintiff Dixon was tortious. In the stop and frisk cases the question presented to the United States Supreme Court was whether the evidence seized as a result of the frisks conducted in those cases should be suppressed because it was obtained in violation of the constitutional guarantee against unreasonable searches and seizures. The Court held that even though there is not probable cause for an arrest it is not always constitutionally unreasonable for a policeman to seize a person and subject him to a limited search for weapons. In so holding the United States Supreme Court decided only the Federal constitutional question. The Court has not precluded a State from deciding as a matter of local law the extent to which it wishes to permit such seizure and search of persons short of formal arrest, as long as the standards for determining what constitutes a reasonable seizure and search are no less restrictive than the Federal standard.

Michigan law has not heretofore recognized a right in a police officer to make the kind of limited seizure and search, the so-called stop and frisk, constitutionally approved by the United States Supreme Court in the stop and frisk cases. Other courts have recognized such a right both by sustaining the constitutionality of stop and frisk legislation and by permitting the stop and frisk practice independently of legislative authorization therefor.[7] No

---

[7] Compare *People* v. *Rivera* (1964), 14 NY2d 441 (201 NE2d 32, 252 NYS2d 458), *certiorari denied* (1965), 379 US 978 (85 S Ct 679, 13 L Ed 2d 568), with *People* v. *Peters* (1966), 18 NY2d 238 (219 NE2d 595, 273 NYS2d 217), *affirmed sub nom. Sibron* v. *New York* (1968), 392 US 40 (88 S Ct 1889, 20 L Ed 2d 917) and authorities in those cases cited. See, also, *State* v. *Terry* (1966), 5 Ohio App 2d 122 (214 NE2d 114), *affirmed Terry* v. *Ohio, supra; United States* v. *Vita* (CA 2, 1961), 294 F2d 524; *People* v. *Amos* (1961), 190 Cal App 2d 384 (11 Cal Rptr 834).

doubt, the United States Supreme Court's declaration of constitutionality, coupled with its apparent justification of the practice as necessary and sound as long as it is undertaken within the narrow circumstances so held to justify such an invasion of the individual's privacy, will provide the necessary philosophical basis which will lead before long to the recognition of some right of limited seizure and search by many, if not most, and perhaps all States either as the result of legislative action or independently thereof.[8]

Be that as it may, a citizen who wishes to stand on his constitutional right against self-incrimination need not answer any question put to him by a police officer,[9] and under existing law no such failure to respond would in itself justify a police officer in taking him into custody. However, Dixon's testimony shows that prior to his formal arrest he was cooperating with the police in an effort to clear himself of any suspicion of wrongdoing.[10] He testified that he had "no objection" to the frisk and that he answered the police officers' questions.[11] It even ap-

---

[8] Cf. Tentative draft No 1, Model Code of Pre-Arraignment Procedure (1966), Art 2.

[9] See *Terry* v. *Ohio, supra* (Mr. Justice White concurring).

[10] No doubt a citizen's cooperation could be obtained by police officers under duress. Surely, if police officers approach a citizen with drawn guns and ask for permission to question and pat him down, they will not be heard to rely on any consent given under those circumstances. The defendant police officers were working in plain clothes and did not draw their guns during the patting down and interrogation of Dixon.

Cf. Tentative Draft No 1, A Model Code of Pre-Arraignment Procedure (1966), § 2.01:

"(1) *Authority to Request Cooperation.* * * * Compliance with a request for information or other cooperation hereunder shall not be deemed involuntary or coerced solely on the ground

(a) that such request was made by one known to be a law enforcement officer; * * *

"(4) *Request to Make Search.* [Reporters' Note: This section will deal with requests to search and consents thereto; it will be drafted in connection with the search and seizure materials.]"

[11] The following is from Dixon's testimony on direct examination:

pears that Dixon may have satisfied the officers, for he testified that they departed his immediate presence before the Canadian soldier entered Dixon's automobile and sought to explain his presence there by telling the police officers that Dixon had driven him to the motel.[12]

In *People* v. *Rivera* (1964), 14 NY2d 441 (201 NE2d 32, 252 NYS2d 458), and *State* v. *Terry* (1966), 5 Ohio App 2d 122 (214 NE2d 114), appellate courts of New York and Ohio approved stop and frisk independently of enabling legislation. The police officers ask us to adopt those holdings in this case. The legal question thus presented is an important one, and, for reasons previously stated, it

---

"*Q* And now, at the time of your arrest, did anyone ask you if you had been engaged in any criminal activity?

"*A* No, what happened, I was down the street from St. Clair, just about a block away and these two officers came up to me and wanted to search me. I had no objection, and one made the remark while I was being searched that 'If he doesn't have a gun, he is not the one.' And the moment of a mention of the gun I wondered what was happening, that this could be very serious, guns being involved, and then they asked me what was my name. I told them and they wanted to know where I lived. I told them. And they wanted to know what I was doing down there and I told them I came down to pick up a *Dan Smith*. They wanted to know who was Dan Smith. I said he was a friend of mine and they left. And then they went back to the car. Back towards this motel. And later they came back, and when they came back they said to me, to come with them down to my car. They had asked me the first time if I had a car, and I told them it was parked down the street. And now they wanted me to go down to the car. And I went with them, I walked to the yard of the motel and they said, 'Is that your car parked over there?' I said it was over behind the hedges on the street. I said, 'Yes.' They said, 'Walk over to the car.' When I walked over to the car, when I got over to the car, I saw the door was opened and this person was sitting there in the car, on the seat, and he jumped up and shouted, 'This is my car. This is my car.' 'You Americans got all this big beautiful car.' He said, 'Look at what a beautiful Buick it is.'

"I was flabbergasted at this time, and most excited, and I looked on the back seat. There was a suitcase, it was opened and a lot of whiskey bottles and half-filled shaving bottles. I said, 'Where did that come from?' And I wasn't allowed to say a word. That's when I was ruthlessly handcuffed, and shoved in the car and headed to the station."

12 The police officers testified that the soldier appeared while they were still questioning Dixon. Dixon testified (see footnote 11) the questioning had concluded and the officers had departed his immediate presence before the soldier appeared

is properly raised before us. In my opinion the parties are entitled to our decision thereon.

No findings of fact were made by the trial judge as to whether the police officers in this case exceeded permissible limits of intrusion under the rule of law they would have us adopt, nor has there been any appraisal of the effect on any liability they may have of the fact Dixon chose to answer their questions and at trial testified he found the initial touching and intrusion unobjectionable.[13] It would be entirely appropriate now to remand for additional fact findings, retaining jurisdiction. Fact findings would facilitate our consideration of the question of law which is here for decision, a question of first impression in Michigan. Alternatively, we can now decide the question of law and, depending on our ruling thereon, consider remand after it is decided for any additional required fact finding. One way or another we should reach the meritorious question presented and decide it.

---

[13] In this connection it should be noted that the trial judge awarded the plaintiff $500 damages because he had been detained in the station house 7 hours with resulting "humiliation, irritation, incarceration over night, and the missing of his church duties the next morning" even though the on-street "detention" prior to the defendant's valid arrest could not have been for more than 5 to 15 minutes. It is apparent that despite the validity of the formal arrest the damages were awarded largely for the formal arrest and not for what occurred at the time Dixon was initially stopped.