OPINION OF THE COURT
Howard E. Goldfluss, J.
In this motion to suppress, the court must determine if there is a concomitant right of an individual to refuse to respond to a police officer’s right of inquiry. The defendant contends that he has such a right and that the seizure of evidence from his person was illegal because such seizure flowed from its exercise.
Officers Boyle and Velez, at the hearing on the motion, testified that on July 5, 1975, in the daytime, they were *1082 patrolling in a radio car. As they were passing through a sector of the 44th Precinct in Bronx County, they observed a male individual, not the defendant, holding a gun. The officers exited from their car with guns drawn and approached the man. He dropped the gun, telling the police that the gun was a toy. Officer Boyle ascertained that this was true, and the man who possessed the toy gun was not arrested.
At this point, Officer Velez observed the defendant acting in an erratic and confused manner. The officer drew this conclusion after observing the defendant walking briskly in different directions. Both officers concluded that the defendant was attempting to avoid their scrutiny, although neither of the officers testified that the defendant actually ran away from the scene.
Officer Velez further testified that he approached the defendant and inquired of him as to whether he lived in the neighborhood. The defendant refused to respond; instead he directed a series of obscenities at Officer Velez, the substance of which was that he had done nothing wrong and that the police had no right to stop him. When Officer Boyle joined Velez, the obscenities were directed at both of them. Boyle attempted to reason with the defendant, asking him to "cool down”* but the defendant complained to the crowd that had gathered that he was being "hassled” by the police. Officer Boyle did not testify that the defendant or any member of the crowd attempted to menace or strike the officers, but he did allege in his testimony that remarks were addressed to him in a tone which caused the officers to believe that their safety was endangered. At that point, when the defendant continued to direct his obscenities at the police, the defendant was placed under arrest for harassment. Officer Boyle then rushed the defendant into the radio car, drove two blocks and then searched him. It was at that point in time that the search revealed the quantity of narcotics which is the subject of the instant indictment.
The defendant, in his testimony, related a different version of the facts. He alleged that at the scene of his eventual arrest, he had just stepped out of a taxi cab to call his girl friend. He stated that the two officers approached him — fired questions at him — and refused to allow him to answer. He specifically denied that he made any comments to a crowd of people. He denied that there was a crowd of people. He did state that he protested his treatment by the officers at the *1083 time of his arrest. He was placed in the patrol car which was driven a few blocks. He was then taken out of the car, slapped a few times, and finally searched and arrested. The defendant called as a witness the cab driver, Nancy Santiago, who testified that she witnessed the original encounter. She said there was no crowd present. Generally, she corroborated the defendant’s version of the occurrence.
In People v Cantor (36 NY2d 106) the court dealt with the specific question of forcible street encounters. Here, as in Cantor, the People do not rely on probable cause, but rather on the proposition that the conduct of the police was reasonable under the circumstances. Under Terry v Ohio (392 US 1) and Adams v Williams (407 US 143), if such conduct is justified at its inception, and is reasonably related in scope to the circumstances which rendered its initiation permissible, then the seizure is valid and the products of the ensuing search are admissible.
If, on the other hand, the initial stop of the defendant is unlawful, and absent an independent establishment of probable cause, evidence thereafter acquired cannot justify or erase this illegality. In Cantor, the court held, that the defendant was deprived of his freedom of movement when he was encircled by three police officers with guns drawn, and that this constituted an unconstitutional seizure prohibited by the Fourth Amendment. Since the lower court in Cantor made a finding that neither probable cause nor reasonable suspicion existed for such seizure, the suppression motion was granted. It is interesting to note that the article suppressed was a gun which the defendant pointed at the officers after the encirclement.
However, we must reconcile the rule laid down in Cantor with a decision by the same court in People v De Bour (40 NY2d 210). This case raised the issue of whether a police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information leading to the defendant’s jeopardy. In De Bour, the defendant was walking on the same side of the street in the direction of two police officers. It was late at night in a high narcotic crime area. When the defendant was approximately 30 feet from the police officers, he crossed the street. The police officers followed him and asked him what he was doing in the neighborhood. The defendant responded (p 213) "clearly but nervously” that he had just *1084 parked his car and was going to a friend’s house. He then asked De Bour for identification. De Bour responded that he had none. It was then that the officer noted a bulge in the defendant’s pocket and ordered him to open his coat. When he complied, the officer saw a gun protruding from his waistband. The defendant, relying on Cantor, moved to suppress. In affirming the lower court’s denial of the motion, the Court of Appeals held that the intrusion of the officer was minimal— that his apprehension was justifiable — and that all the factors stated created an articulable reason sufficient to authorize the police action that was taken.
The similarities of De Bour to Cantor are striking. The dissent found it difficult to reconcile the two in determining the effect of a compelled stop, indicating that the court in Cantor made a clear reiteration of the principle laid down in Terry v Ohio (supra) that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized’ that person” (People v De Bour, supra, p 231).
But the majority in De Bour distinguishes from Cantor by emphasizing (p 217) that De Bour was "merely approached and questioned by two uniformed officers whose conduct bespoke no violent or forcible apprehension.” The court therefore concluded that De Bour was not seized in the sense that Cantor was.
Accepting this distinction, we must then consider the original encounter between the police officers and the defendant Burns.
The authority to intercept persons upon the public street emanates from two independent sources, the common-law right of inquiry (People v Rivera, 14 NY2d 441, cert den 379 US 978), and the so-called stop and frisk law (CPL 140.50). The latter requires the officer to have a "reasonable suspicion” that the detained person is committing, has committed, or is about to commit a crime. Cantor further defines "reasonable suspicion” as that quantum of knowledge which under the circumstances then present, would prompt an ordinarily prudent and cautious man to believe that criminal activity is at hand. A line must be drawn in these instances between vague or unparticularized hunches which will not suffice, and specific, articulable facts which will.
The common-law right of inquiry, on the other hand, operates to permit lawful detentive inquiry upon grounds less compelling than "reasonable suspicion” (see People v Rose *1085 mond, 26 NY2d 101). As the court stated in People v Rivera (supra, pp 444-445): "Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off”. (See People v Peters, 18 NY2d 238, 242-243, affd sub nom. Sibron v New York, 392 US 40.)
But the court in Cantor and De Bour emphasized that the thinnest line exists between a justification for this police conduct and an illegal interference. Even good faith on the part of the police will not validate such interference if it is indeed illegal (see Hill v California, 401 US 797; Smith v County of Nassau, 34 NY2d 18; Terry v Ohio, supra).
This case differs from the normal street confrontation. In most instances, the courts have had to determine the legality of the interference when the defendant, albeit reluctantly, responded to police inquiry. Here, the defendant refused to respond, and by doing so his act mandates a determination of the relative rights of the police and private citizens when such an eventuality occurs.
Since it is incumbent upon the court to make findings of fact after a suppression hearing, I find that with one exception, the testimony of the officers concerning the conduct of the defendant is credible and proven by a fair preponderance of the evidence. The exception is that portion of the officer’s testimony in which he alleged his fear of the crowd. There was no evidence submitted that the crowd, if indeed there was one, attempted to menace or accost the officers, or that it closed in on them. It is significant that the defendant was arrested for harassment of the officer and no mention was made in any police documents offered which referred to incitement to riot, which would have been the proper charge if the defendant’s entreaties resulted in such a consequence.
The defendant’s furtive acts, although admittedly equivocal and subject to innocent interpretation, is precisely the sort of street conduct which the court in De Bour says should be investigated under the coipmon-law right of inquiry. However, De Bour differs from this case in that De Bour responded to the inquiry which gave the police officer opportunity for further observation. The bulge they saw in De Bour’s jacket was in fact the gun seized.
*1086 There was no such observation here. The only manner in which the search of the defendant and seizure of the drug can be justified is that they were made subsequent to a lawful arrest. The legality of Burns’ arrest is the pivotal issue.
The People take the position that if there exists a manifest right of the police to inquire, there must of necessity be a corresponding duty by a citizen to respond. The court in De Bour makes it clear that "not every encounter constitutes a seizure”. (People v De Bour, 40 NY2d 210, 216, supra.) If the inquiry is not a seizure, it is de minimis, an officially sanctioned interference. If we then accept the People’s position, the citizen must abide this interference without protest, and must respond to all questions because he has no legal alternative. Such reasoning has alarming implications. What sets this Nation apart from others is that its system of criminal prosecution is accusatorial, not inquisitorial. A citizen may, if he so chooses, exercise the right to demand that the police secure evidence of his guilt from other sources than from out of his own mouth. The defendant herein exercised his right most vehemently, and had his refusal to answer been accompanied by other acts which could have been the basis for a. charge of harassment, the search incidental to the arrest would have been perfectly proper. No such acts were testified to by the officers. They based their arrest of the defendant on the torrent of abuse directed at them in which he protested in a language of the streets, his right to refuse to respond to the officers’ inquiry. Unquestionably he used gutter language, but the defendant was not obliged to express himself in Shakespearian prose. The Court of Appeals, on at least two occasions, has held that the use of abusive and obscene language toward a police officer and nothing more, is not such conduct which is prohibited under the harassment section (Penal Law, § 240.25, subd 2). (See People v Bacon, 37 NY2d 830; People v Pecorella, 32 NY2d 920.) Abusive as he might have been, there was no testimony from which this court would adduce that the police officers had reasonable, articulable, suspicion that they or each of them was in danger (People v Sanchez, 38 NY2d 72).
This court concludes, therefore, that the arrest for harassment was a penalty suffered by the defendant because he exercised the right of refusal to respond. There was no intervening factor which could give reasonable cause for arrest such as existed in People v Dread (49 AD2d 401) where the defendant took flight and dropped the contraband in plain *1087 view of the pursuing officers — or as in People v Archiopoli (39 AD2d 748) where the defendant also fled upon the policeman’s initiation of the inquiry and assaulted the officer when he was pursued. Also see People v Ludwig (38 NY2d 970) where the defendant’s prior activity, combined with his furtive conduct, gave probable cause for inquiry and detention.
There is a weighing process which is the underlying test utilized in all search and seizure determinations. Balanced against the Government’s interest in the detection and apprehension of criminals is the encroachment involved with respect to an individual’s right to privacy and personal security (see Camara v Municipal Court, 387 US 523; Cupp v Murphy, 412 US 291; People v Kuhn, 33 NY2d 203). Applying that test to this case, the court concludes that a citizen’s right to follow the course that this defendant chose is at least equal to the governmental interest. Although the defendant’s Miranda warning rights did not vest because he was not yet in custody, he could, nevertheless, refuse to respond to precustodial interrogation. The refusal to orally co-operate with police when such co-operation may result in self incrimination is not an abstract notion of individual liberty. It is a real and basic concept of a free society, promulgated because those who founded this Nation had experienced the oppressive alternatives. We must consider what these alternatives were, and continue to strive to avoid them. If by doing so we grant too much liberty to the citizen, such a choice benefits us more than granting too little.
Motion to suppress the physical evidence is granted and the indictment is dismissed.