**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lee SKIPWITH, III, Defendant-Appellant.**

**No. 72–1932.**

United States Court of Appeals, Fifth Circuit.

June 14, 1973.

Herbert P. Sterling, Tampa, Fla., Court-appointed, for defendant-appellant.

John L. Briggs, U. S. Atty., William M. James, Jr., Asst. U. S. Atty., Jacksonville, Fla., Claude H. Tison, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before ALDRICH*, SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

As a result of an airport security search which discovered not weapons but drugs, Lee Skipwith III was charged with and convicted of the possession of cocaine in violation of 21 U.S.C. § 844(a). He contends here that the evidence should have been suppressed, arguing that the search was unconstitutional. We hold that the search was lawful and that the contraband uncovered by it was properly admitted in the court below; thus we affirm.

On May 19, 1971, the defendant presented himself for boarding at the Eastern Airlines boarding gate at the Tampa International Airport, a place at which he knew or should have known he was subject to being searched. Because he met the F.A.A. anti-skyjack profile and stated he had no identification, the Eastern boarding agent detained him and called in a deputy United States marshal. The marshal, Rodriguez, asked the prospective passenger his name. The response was "S. Jackson." This

* Hon. Bailey Aldrich, Senior Circuit Judge of the First Circuit, sitting by designation.

name corresponded to the name on the ticket which the defendant presented. Upon further inquiry, the defendant informed the marshal that he had no identification. The marshal thereupon inquired as to whether a billfold-shaped bulge which was visible in the left rear pocket of defendant's tight-fitting trousers contained any identifying papers. Defendant acknowledged that the bulge was produced by a wallet, but insisted that there were no identifying papers in it since he had left his identification in St. Petersburg. The marshal insisted that he produce the wallet. Skipwith then confessed: "That [S. Jackson] isn't my name. That's my traveling name. My true name is Skipwith." With this disclosure, the marshal directed Skipwith to come with him to a private office. On the way to the office, another deputy marshal, Hardman, called Rodriguez' attention to a visible bulge in Skipwith's right front trouser pocket which was about three inches long and two inches thick. In the office Rodriguez examined the wallet and determined that it contained identification papers bearing the name Lee Skipwith III. According to Rodriguez' testimony, Skipwith was very nervous and appeared to be under the influence of either alcohol or some other drug. Rodriguez then ordered Skipwith to stand up and empty his pockets. Rodriguez testified that he "was inclined to believe that he had a gun in that pocket." Instead, the search revealed a plastic bag containing some white powder which was later determined to be cocaine.

## I.

This court has recently discussed the permissible scope of airport searches in United States v. Moreno, 475 F.2d 44 (5th Cir. 1973). In that case the court held that suspicious activity by the defendant, a ticketed passenger, in the airport lounge area and en route toward a boarding gate made the security officers' search of the defendant's person a reasonable one. Relying on the rationale of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court weighed the competing interests of law enforcement in the context of the present air piracy problem against the rights of individuals using the airport; it concluded that airport searches designed to protect the heavy volume of interstate and foreign travel by air could be conducted under a less stringent standard than ordinary probable cause because of the unique circumstances of time and place.[1]

In *Moreno* constitutional reasonableness was found in suspicious activity by a ticketed passenger headed toward a boarding gate but still in the general airport area. Today we are called upon to apply the same standard of reasonableness to a situation factually unlike *Moreno*. Here the defendant, Skipwith, had actually presented himself at the boarding gate as a potential passenger. He could not have been where he was to look around, to greet friends or relatives or to say farewell. His only reason for being there had to be to board the aircraft. Because of the widespread publicity given to the government's efforts to cope with the piracy of aircraft, it was general knowledge that citizens boarding planes were subject to special scrutiny and to weapon searches. Unlike *Moreno* or *Legato* the officer did not go to Skipwith and stop and search him at a point where such a procedure was extraordinary or unexpected. Rather, Skipwith came to the specific part of the airport where he knew or should have known all citizens were subject to being searched.

Since Skipwith exhibited characteristics which corresponded to the F.A.A.'s

---

1. Even more recently this court followed Moreno in United States v. Legato, 480 F.2d 408 (5th Cir. 1973). In *Legato* the court held that suspicious conduct and an informer's tip justified the airport parking lot search of one who had been to the boarding area but at the time of the search was apparently preparing to get into a car and leave the airport.

likely skyjacker profile, it may be that this was all that was needed to validate his detention and search here. Undoubtedly this profile, developed from a distillation of characteristics attributable to previous skyjackers, is a valuable and useful tool in the hands of the airport security officers.[2] However, the factual matrix of the case at bar makes it unnecessary for us to decide whether an airport search based on the profile alone would satisfy the test of reasonableness in all cases.

 The government contends that, in light of the magnitude of the perils created by air piracy, searches of boarding passengers are controlled by the same standard applied to customs searches at the national border—mere or unsupported suspicion.[3] Bitter experience has taught us that the physical dangers of mass kidnapping and extortion posed by air piracy are even greater than the dangers against which the usual border search is directed. Necessity alone, however, whether produced by danger or otherwise, does not in itself make all non-probable-cause searches reasonable.[4] Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting the potential harm. On the opposite balance we must evaluate the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails.

In undertaking our calculation of the weight to be accorded to these three factors in the case at bar—public necessity, efficacy of the search, and degree of intrusion—we need not reiterate what was said in *Moreno* about the dangers posed by air piracy; suffice it to say that there is a judicially-recognized necessity to insure that the potential harms of air piracy are foiled. The search procedures have every indicia of being the most efficacious that could be used. The group being screened is limited to persons with the immediate intention of boarding aircraft. Metal detectors, visual inspection, and rare but potential physical searches appear to this court to provide as much efficiency to the process as it could have.[5]

On the other side of the judicial scales, the intrusion which the airport search imposes on the public is not insubstantial. It is inconvenient and annoying, in some cases it may be embarrassing, and at times it can be incriminating. There are several factors, however, which make this search less offensive to the searched person than similar searches in other contexts. One such factor is the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point. As one commentator has put it in the border search context, "individuals searched because of their membership in a morally neutral class have less cause to feel insulted. . . ."[6] In addition, the offensiveness of the screening process is somewhat mitigated by the fact that the person to be

---

2. *See* United States v. Lopez, 328 F.Supp. 1077 (E.D.N.Y.1971).

3. The fact that one is in the process of crossing an international boundary provides sufficient reason in itself to permit a search for aliens or contraband, without the presence of any other circumstances that would normally have to attend the requirements of the Fourth Amendment.
United States v. McDaniel, 463 F.2d 129, 132 (5th Cir. 1972).

4. For example, no court has ever approved a dragnet search of all citizens in a high-

crime area of any urban center, based upon the justification that the danger of criminal conduct would be reduced.

5. The record in this case contains no direct proof of results of such procedures, but it is a matter of general knowledge that the incidence of air piracy has dramatically decreased since the institution of stricter airport security measures at the beginning of 1973.

6. Note, Border Searches and the Fourth Amendment, 77 Yale L.J. 1007, 1014 (1968).

searched must voluntarily come to and enter the search area. He has every opportunity to avoid the procedure by not entering the boarding area. Finally, the circumstances under which the airport search is conducted make it much less likely that abuses will occur. Unlike searches conducted on dark and lonely streets at night where often the officer and the subject are the only witnesses, these searches are made under supervision and not far from the scrutiny of the traveling public. Moreover, the airlines, which have their representatives present, have a definite and substantial interest in assuring that their passengers are not unnecessarily harassed. The officers conducting the search under these circumstances are much more likely to be solicitous of the Fourth Amendment rights of the traveling public than in more isolated, unsupervised surroundings.

■■ Our conclusion, after this tripartite weighing of the relevant factors, is that the standards for initiating a search of a person at the boarding gate should be no more stringent than those applied in border crossing situations. In the critical pre-boarding area where this search started, reasonableness does not require that officers search only those passengers who meet a profile or who manifest signs of nervousness or who otherwise appear suspicious. Such a requirement would have to assume that hijackers are readily identifiable or that they invariably possess certain traits. The number of lives placed at hazard by this criminal paranoia forbid taking such deadly chances. As Judge Friendly has stated:

> Determination of what is reasonable requires a weighing of the harm against the need. When the object of the search is simply the detection of past crime, probable cause to arrest is generally the appropriate test. . . . When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets

the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.

United States v. Bell, 464 F.2d 667, 675 (2d Cir. 1972) (concurring) (footnote omitted). Thus, while *Moreno* established that searches of certain persons in the general airport area are to be tested under a case-by-case application of the reasonableness standard, we hold that those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion.

The distinction we draw between a person entering any specific area—here the boarding gate—where searches are regularly conducted and one like *Moreno* who was in an airport restroom is analogous to that drawn in United States v. Thompson, 475 F.2d 1359 (5th Cir. 1973). There the court pointed out the distinction between searches made at the nation's borders and those which are made within the interior of the country. "Searches in this undefined zone [remote from but near the border] must be reasonable upon all of the facts, one consideration being the proximity of the search to an international border. . . . When acting in this expanded border search area, the customs agents must have a 'reasonable suspicion' that the customs laws are being violated." 475 F.2d at 1362. Searches at the border proper, on the other hand, may be conducted "where there is a 'mere suspicion' of possible illegal activity." 475 F.2d at 1361. The logic which supports the application of this border search distinction to the standards governing airport searches is readily apparent. The public is assured that the net can sweep no wider than necessary since the broad right to search is limited to the last possible point in time and space which could protect the aircraft, the boarding

gate (or secure corridor entrance). Thus, no mere passerby will be subjected to this search—only those in the act of boarding planes could be involved. The merits of Skipwith's claim that this particular search would have been unreasonable before he passed the *locus poenitentiae*—the point at which he presented himself as a passenger for boarding— are hypothetical. There is simply no need to determine whether this search satisfied the *Moreno*-established standard for airport area searches, because Skipwith had presented himself as a prospective passenger at the boarding gate.

Skipwith further contends that even if some search were justified, the search actually undertaken exceeded the scope of the justification. He argues that the officer was constitutionally limited to conducting a frisk or pat-down for weapons rather than demanding that he empty his pockets. As *Moreno* pointed out, however, a hijacker's arsenal "is not confined to the cumbersome gun or knife; for modern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube. A detonator planted in a fountain pen is all that is required to set it off. . . . It is in this context that we must assess the constitutionality of the search. . . ." 475 F.2d at 49. The range and variety of devices real and simulated which can be used to intimidate the crew of an aircraft when it is aloft are almost limitless. The airport security officer has to be alert for all of them. Marshal Rodriguez was justified in undertaking a search with sufficient scope to reveal any object or instrumentality that Skipwith could reasonably have used to effect an act of air piracy. Here the search object—which created a three-inch-long, two-inch-thick bulge— was clearly within that limit.

Moreover, Judge Simpson and I fully concur in that part of Judge Aldrich's opinion which holds that Skip-

with's right-to-leave argument is devoid of merit. Thus, this court expressly declines to follow the rule announced in United States v. Meulener, 351 F.Supp. 1284 (C.D.Cal.1972). *Cf.* United States v. Legato, *supra*, 480 F.2d at 413 and n. 8.

II.

Skipwith contends that, even if a weapon discovered during his search could have been introduced into evidence, the cocaine should have been excluded since the search was not and could not have been conducted for the purpose of discovering illicit drugs. In light of Judge Aldrich's dissent, it is appropriate to discuss more fully than would otherwise be indicated our holding that the product of this valid search was properly admitted into evidence.

Under the pressure of a search for truth and in light of a growing skepticism as to both its necessity and efficacy, the exclusionary rule is waning, not waxing, in the law today. *See, e. g.,* Wright, Must the Criminal Go Free if the Constable Blunders? 50 Tex.L.R. 736 (1972). "Proper adjudication of cases in which the exclusionary rule is invoked demands a constant awareness of [its] limitations." Terry v. Ohio, *supra*, 392 U.S. at 14, 88 S.Ct. at 1876; United States v. Ragsdale, 470 F.2d 24, 30 (5th Cir. 1972). The strictures of the Fourth Amendment protect the citizen from unwarranted and unreasonable intrusion by the government on his person or into his effects. The rule excluding the admission of illegally obtained evidence was designed to effectuate this purpose by removing the principal incentive to conduct illegal searches. The rule does not exist because the evidence is not probative, or to chastise errant law officers, or to benefit the accused.

While the force of Judge Aldrich's admonition that "due process demands that the imposition on the citizen be no greater than the occasion requires" cannot be disputed, it is important to note that the imposition which must be con-

sidered is the intrusion on a citizen's right to be free of unreasonable searches, not upon any right to be free of criminal prosecution. Certainly the imposition of a criminal penalty for possession of drugs found during an airport search will burden the one on whom it is imposed; constitutionally speaking, however, he has suffered only the same intrusion as other passengers who were searched. Although the discovery of cocaine in a search for weapons may be unexpected by the government, there is nothing in the Constitution that gives the apprehended felon a right to complain because the product of the protective action was not anticipated. Such a result cannot properly be classified as a windfall. It is the product of valid police work. The government has no duty to catch a carrier of dope sportingly or according to any game book rule. Nor is it material whether the circumstances leading to the discovery of the cocaine were of the defendant's making; all that matters is that the search be legally conducted.

We are asked to exclude the evidence of crime obtained in a concededly valid seach in order to enhance the overall reasonableness of the search procedure. The basis on which we are urged to adopt this would-be exception to the general exclusionary rule is that the relaxed standards of airport searches require a different calculus in evaluating their purpose. It is said that in airport search situations, where relatively inflexible probable cause is displaced by its more mutable concomitant—reasonableness— as the standard validating the search, the real utility of the exclusionary rule lies not in discouraging illegal searches, for there are relatively few of those, but rather in discouraging the pretextual search—that is, the search outwardly

appearing to be conducted to discover weapons in the skyjacker's arsenal which really seeks contraband or evidence for which only a warranted or probable cause search would be lawful. The basis for excluding any evidence other than skyjack weapons detected during desirable and necessary anti-piracy searches is that this exceptional exclusion will destroy the incentive for officers to conduct pretextual searches.

This argument has never been accepted by any court [7] and it was just rejected by this court in *Moreno* and *Legato* in situations completely analogous to the one presented here. Even were the precedents not so clear, such a departure from the established rule is not justified. Assuming arguendo that a significant number of airport searches are actually conducted to discover evidence or contraband rather than skyjack weapons (a premise which has by no means been established), it does not follow that the suggested rule would be a significant deterrent of that behavior.

The exclusionary rule necessarily deters only those searches which have as their object the production of evidence for the purpose of conducting a successful criminal prosecution. The fact is, however, that searches may be and are conducted for other purposes. In the performance of their duty to apprehend, not prosecute, the searching officer may neither know nor care whether the offender is actually convicted. In addition, if we are to postulate that some significant number of pretextual airport searches are conducted, then we should also assume that officers may from time to time make searches and seizures for reasons other than those relating to criminal prosecution, perhaps to seize suspected contraband or with no purpose

---

7. As Judge Aldrich points out in his dissent, the majority opinion in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the companion case to *Terry*, did not reach the issue of the admissibility of contraband seized during a *Terry* self-protective search. However, the three separate opinions of Justices White, 392 U.S. at 69–70, 88 S.Ct. at 1905, Harlan, 392 U.S. at 79, 88 S. Ct. at 1910, and Black, 392 U.S. at 79–80, 88 S.Ct. at 1910–1911, assumed it would have been admissible as a matter of course.

other than to harass certain individuals. Moreover, since the airport boarding gate search will usually be legally authorized, a declaration by the court that certain of its fruits are inadmissible will carry with it neither the moral censure nor the threat of disciplinary action or civil suit implicit in a judicial application of the conventional exclusionary rule, where the court's adjudication that the evidence is inadmissible also amounts to a determination that the officer exceeded his authority. Thus, in reckoning what could be, it seems most likely that the proposed rule would have very little deterrent effect on a pretextual airport search. Without the slightest intent to approve any misuse of airport search authority, we must recognize that "a stern refusal by this Court to condone such activity does not necessarily render it responsive to the exclusionary rule." Terry v. Ohio, *supra*, 392 U. S. at 14, 88 S.Ct. at 1876, 20 L.Ed.2d 889.

Professor Wright's observation on the efficacy of the exclusionary rule in general is particularly pertinent to its proposed application here.

> [I]t can be fairly said of the Exclusionary Rule that it cannot be proved to have a significant deterrent effect and this effect is not so inherently likely that we can assume it to exist in the absence of proof.

50 Tex.L.R. at 741. Were there no societal costs in adopting the rule contended for, the speculative possibility that some undesirable searches would be discouraged might justify its imposition. The fact is, however, that the rule would allow a significant number of crimes to go unpunished though the authorities may have lawfully obtained all of the evidence necessary to establish the guilt of the offenders. The unproven potential of this variant on the exclusionary rule simply does not justify the public detri-

ment in allowing this class of criminals to go unconvicted.

No one can gainsay that airport searches are annoying. Certainly all citizens look forward to the day when skyjackings and their sequels, airport search and security measures, cease. When the threat of air piracy disappears the standards of reasonableness which we here recognize will go with it. Until that time arrives, however, the portent for evil supplies the requisite Fourth Amendment reasonableness to justify the search of any person who presents himself at a boarding gate to enter an aircraft.

In light of our holdings that the search was valid and that there was no error in the admission into evidence of the contraband discovered, the conviction of Lee Skipwith III is

Affirmed.

SIMPSON, Circuit Judge (concurring specially):

I concur in the disposition of this case reached by Judge Clark's opinion, that the conviction stand affirmed.

If free to do so, I would adopt Judge Aldrich's proposal that we refuse to permit the contraband seized to become the basis for prosecution. The protection of the travelling public from attempts at skyjacking demands that courts allow airport guards wide discretion in searching prospective passengers. Because this is so and to forestall abuse of that discretion by pretextual searches we should adopt a rule that forbids the evidentiary use of contraband other than weapons turned up as a by-product of such searches. In a word, I believe that Judge Aldrich's position is both sound and salutary.

But I consider that while not directly, certainly by implication, our recent *Moreno*[1] and *Legato*[2] cases have rejected this approach. *Moreno* and *Legato* approve the use of contraband discov-

---

1. United States v. Moreno, 475 F.2d 44, 5 Cir. 1973.

2. United States v. Legato, 408 F.2d 480, 5th Cir. 1973.

ered in an airport search of a prospective passenger for a weapon as the basis for conviction of possession of the contraband. Any holding that the contraband here although subject to seizure and condemnation should not have been made the basis for a conviction, is I think forbidden by *Moreno* and *Legato*.

Thus, while I would follow Judge Aldrich's solution if free to do so, I am constrained by *Moreno* to concur in the result reached by Judge Clark.

ALDRICH, Senior Circuit Judge (dissenting):

I recognize and approve the Fifth Circuit practice of regarding as binding precedent prior decisions of other panels. It does not, however, seem to me to forbid that I, as a visiting judge, vocalize dissent on a matter of general importance. Present day airport search affects such a large number of persons, country-wide, that I wish to record my reasons for differing with the Fifth Circuit rule announced, without discussion, in United States v. Moreno, 1973, 475 F.2d 44, and United States v. Legato, 1973, 480 F.2d 408, and followed here, that Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, authorizes the use of extraneous materials not within the purpose of the search, but fortuitously discovered in the passenger's possession, to support a criminal prosecution. I fully agree with the court's weighing of values to conclude that the search itself was authorized, but I feel that a more exact assessment should dictate an additional conclusion, namely, that viable use (I am not speaking of mere confiscation) should not be made of proceeds towards which the search was not, and could not have been independently, directed.

There can be no question, of course, as to the object of the search, or of the limited justification. The passenger was not under arrest, opening him to a total examination. Chimel v. California, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685. He had done nothing as an individual to afford probable cause for interfering with his right of privacy,[1] but was merely exercising his constitutional right to travel, Shapiro v. Thompson, 1969, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600, in a manner he had a right to. As the Court has said of the *Terry* pat-down, "The purpose of this limited search is not to discover evidence of crime." Adams v. Williams, 1972, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612. The general occasion justified the search, but no conduct of the defendant, and no governmental need, called for the government to receive a windfall.

In this circumstance I believe that while the peculiar nature of the social hazard justifies the search, due process demands that the imposition on the citizen be no greater than the occasion requires. We should take literally the caveat in *Terry*, "*seizure* and search [must be] reasonably related in scope to the justification for their initiation." 392 U.S. at 29, 88 S.Ct. at 1884 (emphasis suppl.) *See* New York v. Sibron, 18 N.Y.2d 603, 605–608, 272 N.Y.S.2d 374, 219 N.E.2d 196 (Van Voorhis, dissenting), rev'd, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917.[2]

---

1. While the Profile is said to be remarkably inclusive as an identifier, in camera inspection thereof suggests that many innocent persons might fit it exactly. And if the defendant revealed minor grounds for suspicion after the agent demanded his wallet, unless the demand was a priori justified it is axiomatic that the reaction to it could not supply justification ex post facto. Sibron v. New York, 1968, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed. 2d 917; Henry v. United States, 1959, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d

134; Johnson v. United States, 1948, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92 L.Ed. 436.

2. See, also, The Fourth Amendment and Housing Inspections, 77 Yale L.J. 521, 535 (1968), where the same suggestion was made with respect to blanket housing inspections justified only by "group probable cause." Camera v. Municipal Court, 1967, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930.

There is both a private and a public reason for this. As to the first, not only does it seem unfair for the government to profit from a circumstance that was none of the defendant's making, but no hope of striking it rich should serve to lure the agent into a broader search than he would have chosen to make had hijacking materials been his maximum objective. Where special circumstances are allowed to reduce the ordinary conditions precedent to a lawful search there should be special safeguards to see that the opportunity is not abused. See New York v. Sibron, supra, 18 N.Y.2d at 605–608, 272 N.Y.S.2d 374, 219 N.E.2d 196.[3] I believe the same prophylactic principle that dictates exclusion of property unlawfully seized, Mapp v. Ohio, 1961, 367 U.S. 643, 657–659, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Elkins v. United States, 1960, 364 U.S. 206, 217–218, 80 S.Ct. 1437, 4 L.Ed.2d 1669, should be employed to temper possibly overzealous airport searches. Such a rule would not only limit the decision to make, and the extent of, searches to what the justification permitted in the first place; it would isolate the procedure and guarantee to the public that the government is not using airport search procedure for other purposes, an offensive thought to any innocent person suffering the inconvenience.

Returning to United States v. Moreno, and United States v. Legato, supra, I cannot agree that my suggestion runs counter to *Terry*. In *Terry* the prosecution was for the sought-after weapon itself. In the companion case of New York v. Peters, 1966, 18 N.Y.2d 238, 273 N.Y.S.2d 217, 219 N.E.2d 595, aff'd sub nom. Sibron v. New York, 1968, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, where burglars' tools, rather than a weapon, were found, the Court was careful not to decide the present question, pointing out that prior to the search there had been probable cause for arrest for attempted burglary, adequately justifying the seizure of the tools. It is true that I am advocating an unusual and narrow rule, but we are faced with an unusual and narrow justification for governmental interference.

■ Finally, if the foregoing is not to be supported, I do not accept defendant's contention that, once he had reached the point of embarkation where inquiry and possible search procedures were openly in operation, he could choose to withdraw if he found the inquiry addressed to him not to his liking. United States v. Meulener, C.D.Cal., 1972, 351 F.Supp. 1284. The reasoning in *Meulener,* that if he then changed his mind, and elected to leave, "he would pose no danger to the passengers and crew on the aircraft," 351 F.Supp. at 1289, greatly damages the prophylactic purpose of the search procedure. Such an option would constitute a one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful. Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would, by diminishing the risk, encourage attempts. Established search procedures are perhaps more valuable by what they discourage than by what they discover. I see no constitutional requirement, where a defendant knew by objective signs that he was incurring the possibility of a search, that he should thereafter be allowed to play heads-I-win, tails-you-lose.

3. As one commentator has stated, "Where the policeman claims to have felt a hard object in the defendant's pocket which may have been a knife but, upon delving into the pocket, he discovers some other type of contraband, [it may be] difficult to prove that the initial inference was an unreasonable or dishonest one, or that, in searching for the 'knife', the policeman conducted too extensive a search of the pocket." The Supreme Court, 1967 Term, 82 Harv.L.Rev. 63, 185–86.