125 N.J. Super. 587 (1973)
312 A.2d 642
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RAYMOND ADAMS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 10, 1973.
Decided December 3, 1973.
*588 Before Judges KOLOVSKY, FRITZ and CRANE.
*589 Mrs. Sara A. Friedman, Assistant Prosecutor, argued the cause for appellant (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
Mr. Donald S. Goldman argued the cause for respondent (Messrs. Goldman, Goldman & Caprio, attorneys).
The opinion of the court was delivered by KOLOVSKY, P.J.A.D.
The State appeals, upon leave granted, from an order suppressing evidence found on defendant's person when he was frisked by a deputy United States marshal at the boarding area at Eastern Airline Gate 14 of the Newark Airport and evidence thereafter found when the attache case he was carrying was opened.
We reverse because we are satisfied that the marshal acted reasonably and lawfully in conducting a pat-down of defendant and then in placing him under arrest and searching his attache case when the pat-down disclosed incriminating evidence.
It is uncontradicted that the marshal was stationed in the boarding area in furtherance of the "anti-hijacking" program developed by the Federal Aviation Administration (F.A.A.). The F.A.A. program has uniformly withstood constitutional challenge. See United States v. Slocum, 464 F.2d 1180 (3 Cir.1972); United States v. Lopez, 328 F. Supp. 1077 (E.D.N.Y. 1971).
The program contemplates an initial screening of passengers by airline personnel to see whether they exhibit characteristics included within the "profile" of potential hijackers developed by the F.A.A. through the utilization of statistical, sociological and psychological data and techniques. If a passenger conforms to the profile, the airline personnel alert a deputy United States marshal or other personnel in the boarding area of the presence of a "selectee."
In the boarding area is installed a magnetometer, an electronic metal detector, through which all passengers must *590 pass. A passenger who matches the profile and who causes the magnetometer to light up, thus indicating the presence of metal on his person, is interviewed by the marshal. If the interview is less than satisfactory, the program calls for a frisk or pat-down by the marshal, either with or without the passenger's consent. (For a fuller description of the F.A.A. program, see United States v. Slocum, supra, and United States v. Lopez, supra.)
Courts which have dealt with challenges to searches of airplane passengers who have entered the boarding area of airports have taken varying approaches in ruling on the validity of the search.
In United States v. Skipwith, 482 F.2d 1272 (5 Cir.1973), defendant, who had a ticket bearing the name "S. Jackson," had been detained by airline personnel at a boarding gate of the Tampa airport "because he met the F.A.A. anti-skyjack profile and stated he had no identification." A deputy United States marshal was called in. When the marshal insisted that defendant produce his wallet, defendant admitted that his name was Skipwith, saying that S. Jackson was his "traveling name." Defendant was ordered to a private office. On the way there, another marshal called to the first marshal's attention a visible bulge about three inches long and two inches thick in defendant's right front trouser pocket. The wallet, when examined in the office, contained identification papers with the name "Skipwith." According to the marshal, defendant "was very nervous and appeared to be under the influence of either alcohol or some other drug." Defendant was ordered to stand up and empty his pockets. The search revealed a plastic bag containing powder later identified as cocaine. In upholding the validity of the search, the court, after noting the distinctive considerations applicable to a search in the general airport area (see United States v. Moreno, 475 F.2d 44 (5 Cir.1973)) and a search in a boarding area, said:
*591 * * * Because of the widespread publicity given to the government's efforts to cope with the piracy of aircraft, it was general knowledge that citizens boarding planes were subject to special scrutiny and to weapon searches. Unlike Moreno or Legato [United States v. Legato, 480 F.2d 408 (5 Cir.1973)] the officer did not go to Skipwith and stop and search him at a point where such a procedure was extraordinary or unexpected. Rather, Skipwith came to the specific part of the airport where he knew or should have known all citizens were subject to being searched.
Since Skipwith exhibited characteristics which corresponded to the F.A.A.'s likely skyjacker profile, it may be that this was all that was needed to validate his detention and search here. Undoubtedly this profile, developed from a distillation of characteristics attributable to previous skyjackers, is a valuable and useful tool in the hands of the airport security officers. However, the factual matrix of the case at bar makes it unnecessary for us to decide whether an airport search based on the profile alone would satisfy the test of reasonableness in all cases.
The government contends that, in light of the magnitude of the perils created by air piracy, searches of boarding passengers are controlled by the same standard applied to customs searches at the national border  mere or unsupported suspicion. [United States v. McDaniel, 463 F.2d 129, 132 (5 Cir.1972)] Bitter experience has taught us that the physical dangers of mass kidnapping and extortion posed by air piracy are even greater than the dangers against which the usual border search is directed. Necessity alone, however, whether produced by danger or otherwise, does not in itself make all non-probable-cause searches reasonable. Reasonableness requires that the courts must weigh more than the necessity of the search in terms of possible harm to the public. The equation must also take into account the likelihood that the search procedure will be effective in averting potential harm. On the opposite balance we must evaluate the degree and nature of intrusion into the privacy of the person and effects of the citizen which the search entails. [at 1274-1275]

* * * * * * * *
Our conclusion, after this tripartite weighing of the relevant factors, is that the standards for initiating a search of a person at the boarding gate should be no more stringent than those applied in border crossing situations. In the critical pre-boarding area where this search started, reasonableness does not require that officers search only those passengers who meet a profile or who manifest signs of nervousness or who otherwise appear suspicious. Such a requirement would have to assume that hijackers are readily identifiable or that they invariably possess certain traits. The number of lives placed at hazard by this criminal paranoia forbid taking such deadly chances. * * * [W]e hold that those who actually present themselves for boarding on an air carrier, like those seeking entrance into the country, are subject to a search based on mere or unsupported suspicion. [at 1276]
*592 * * * The logic which supports the application of this border search distinction to the standards governing airport searches is readily apparent. The public is assured that the net can sweep no wider than necessary since the broad right to search is limited to the last possible point in time and space which could protect the aircraft, the boarding gate (or secure corridor entrance). Thus, no mere passerby will be subjected to this search  only those in the act of boarding planes could be involved. * * *. [at 1276-1277]
In United States v. Bell, 464 F.2d 667 (2 Cir.1972), the court sustained the denial of a motion to suppress evidence, a bundle of glassine envelopes containing heroin found in defendant's raincoat pocket after the marshal who patted down defendant felt "hard objects about four or five inches long" in the pocket. Although the three judges who decided the case agreed on the result, the majority bottomed their conclusion that the pat down was reasonable on what Walsh, the marshal, then knew, saying:
At this point, Walsh knew that Bell fell into the small category of passengers designated as "selectees"; he had activated the magnetometer, he had no personal identification and he freely admitted that he was out on bail facing narcotics and attempted murder charges. Had Walsh failed to stop Bell he would have been derelict in his duties as a marshal, charged with the responsibility of detecting potential hijackers. His action was eminently sensible and reasonable under the test of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). [at 672]
In a concurring opinion, Chief Judge Friendly first rejected any implication that searches of airplane passengers are lawful only in circumstances where the passenger matches a "profile" and activates a magnetometer, and then continued:
* * * At least so long as the present wave of airplane hijacking continues, permissible subjection of airline passengers and their baggage to a search for objects that might be used for air piracy or to cause or constitute a threat of an explosion goes far beyond this.
The Founders banned only "unreasonable searches and seizures." Determination of what is reasonable requires a weighing of the harm against the need. When the object of the search is simply the detection of past crime, probable cause to arrest is generally the appropriate test. On the other hand, when "a police officer observes unusual *593 conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," a lower standard prevails. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). The threatened criminal activity in Terry was the burglary of a store. When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger alone meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.
Since all air passengers and their baggage can thus be constitutionally searched, there is no legal objection to searching only some, thereby lessening inconvenience and delay, provided there is no national or racial discrimination without a rational basis (such as the destination of a particular flight). I would thus have no difficulty in sustaining a search that was based on nothing more than the trained intuition of an airline ticket agent or a marshal of the Anti-Hijacking Task Force, as the Third Circuit did in United States v. Lindsey, 451 F.2d 701 (1971). Moreover, the existence of a program does not preclude the search of someone outside it, whether for some reason, as in Lindsey, or because of pardonable error.
In other words, while the Federal Aviation Administration is to be commended for its efforts to devise a program that limits intrusions on privacy and reduces flight delays, this should be recognized as a self-imposed expedient for minimizing inconvenience to those not believed to constitute a danger, not as an element necessary to validate a particular search. And the courts should say nothing that would create doubt concerning the legality of wider or less precise measures when and if these should prove to be needed. [at 674-675]
Except for United States v. Skipwith, supra, other cases which have dealt with the issue have in substance adopted the approach of the majority in United States v. Bell, supra. See the following cases in which the searches were held valid: United States v. Lindsey, 451 F.2d 701 (3 Cir.1971), cert. den. 405 U.S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463; United States v. Slocum, 464 F.2d 1180 (3 Cir.1972); see also People v. Botos, 27 Cal. App.3d 774, 104 Cal. Rptr. 193 (Ct. App. 1972), and People v. De Strulle, 28 Cal. App. 3d 477, 104 Cal. Rptr. 639 (Ct. App. 1972) (in which the court also found consent to the search), and the following *594 cases in which the searches were held invalid: United States v. Ruiz-Estrella, 481 F.2d 723 (2 Cir.1973); United States v. Kroll, 481 F.2d 884 (8 Cir.1973), aff'g 351 F. Supp. 148 (W.D. Mo. 1972); United States v. Lopez, 328 F. Supp. 1077 (E.D.N.Y. 1971); United States v. Meulener, 351 F. Supp. 1284 (C.D. Cal. 1972). To the extent that some of the latter cases cited give additional or other reasons for declaring the search invalid, those reasons will be dealt with later in this opinion.
As persuasive as we find the theory advanced by Chief Judge Friendly in his concurring opinion in United States v. Bell, supra, it is not necessary that we adopt it for a proper determination of this case. Nor need we even adopt the rule of United States v. Skipwith, supra, "that those who actually present themselves for boarding on an air carrier * * * are subject to a search based on mere or unsupported suspicion."
It suffices for the disposition of this case that we are satisfied, from all the facts adduced at the hearing on the motion to suppress, that the suspicions of the marshal were reasonable and justified his action in first patting down and then searching defendant and this even if  as the court found, contrary to the testimony of the marshal  defendant had not consented to the pat-down.
From the testimony offered at the hearing on the motion it appears that at about 10:30 A.M. on the day in question defendant, after purchasing a ticket for Eastern Airlines flight 655 from Newark to Lexington, Kentucky, left the general airport area and entered the boarding area for that flight at gate 14.
Situate in the boarding area, at a point near the door through which passengers walked to the steps leading up to the plane, and at a distance of some 50 or 60 feet from the steps, was a magnetometer through which passengers passed before leaving through the door.
Nemara, a federal marshal stationed at gate 14, was advised by a ticket agent that a "selectee who had a complete *595 profile" was about to enter the boarding area. Stationing himself at the magnetometer Nemara observed that, as defendant passed through, he "set off the magnetometer"; a "high light" came on, indicating "that he had some sort of metal on his person." Defendant looked "high," appearing to be "under the influence of something [although Nemara] was not sure if it was narcotics or not." Defendant talked "with a slur. His eyes were dilated." (Defendant himself later testified that he had injected himself with seven or eight bags of heroin some four hours earlier, at 6:30 or 7:00 A.M.)
According to Nemara: he then identified himself and asked defendant whether he had any identification on him. After defendant answered "no," he was asked whether he would consent to a "pat down search." He said that he would and was taken to a less public area outside of gate 14 where a pat-down search revealed a small hard bulge in the left front pocket of defendant's jacket. Nemara reached into the pocket and found an eye-drop type syringe and needle about three inches long and approximately a half ounce of heroin in a glassine envelope. Defendant was placed under arrest and taken to the United States Marshal's office in the airport where the attache case he carried was opened and found to contain various capsules and other items as well as $19,800 in cash. By that time defendant was "in a very high state * * * falling asleep while standing up."
Defendant's testimony at the hearing on the motion contradicted that of Nemara. Defendant denied that he had ever consented to a search. He disclaimed any knowledge of having passed through a magnetometer. According to him:
* * * upon getting ready to board the plane I was stopped [at a point outside the door through which he left to board the plane] and told that I had set off a metal detective device and I would have to submit to a search. I stated at that time that everybody else had gotten onto the plane and had not been searched, so I said I do not feel that I should be searched. I said, "so therefore if you don't *596 want me on your plane I will give you your ticket back and leave the airport."
This is when he identified himself as a United States Marshall. He told me that I had to be searched. This is when he proceeded to search me [and] * * * went into my [left hand] pocket * * *.
That is when "he found the heroin, syringe and also some methadone pills." "He placed me under arrest." Defendant then confirmed that he was taken to another gate where his person and his brief case were searched. On cross-examination defendant admitted that at the time of the hearing he was serving a five-year sentence on a conviction for possession of narcotics.
The trial court, in granting the motion to suppress, credited defendant's testimony that he had not consented to a search and found that "both searches were made over defendant's protest." The court noted the State had offered no proofs as to the details of the "profile" and how it worked, or of the "mechanics of the [magnetometer's] operation." (Nemara had testified that he was barred, for security reasons, from divulging the details of the profile.) In view thereof, the court concluded:
* * * the behavior of the magnetometer cannot even be considered in weighing the reasonableness of the search just as I cannot credit in any way the role of the "profile." I have no knowledge as to what either of these devices are. For all that appears I can only judge that this defendant was arbitrarily stopped.
The court then made the following additional findings in support of its ruling:
Even if I were to accept on faith the infallibility of the magnetometer I would have to conclude that in fact it did not react to the defendant's person in incriminating fashion. The subsequent search disclosed no weapon on the man's person or in the attache case. When I say weapon I have in mind a quantity of metal in an amount comparable to what would be found in a weapon. I therefore reject the contention that it was relied upon by the Marshall as a reason to stop the defendant and pat him down. The defendant denies that the machine rang, and I doubt that it did.
*597 Even assuming the legitimacy of the pat down, all that was thereby disclosed was a "small bulge," something which is unremarkable in the clothing of the ordinary traveler. Without knowing more about the factual character of the bulge and what it implied to the Marshall I do not see how it brings the search which followed within any of the exceptions to the rule requiring the prior issuance of a warrant.
Furthermore, I find that the defendant declined to submit to a search in this case. He did not consent to it and he did request the opportunity to return his ticket and leave without boarding the plane. He said he did not want his person or his baggage searched. Having stated his position, even assuming that we get by all these other objections, he had a right to have his privilege respected.
We shall assume for the purposes of this opinion the correctness of the trial court's findings that defendant had not consented to a search and that he had requested "the opportunity to return his ticket and leave without boarding the plane."
However, the record does not support the findings that (1) the magnetometer did not "react" when defendant passed through it, (2) the marshal did not rely on such reaction in stopping defendant and patting him down, and (3) the bulge in defendant's pocket was not of a character to justify the marshal in reaching into the pocket and removing what was therein. We conclude that those findings were clearly mistaken ones, "so plainly unwarranted that the interests of justice demand intervention and correction," State v. Johnson, 42 N.J. 146, 162 (1964), in the exercise of our constitutional power "to review the fact determinations of a trial court in all cases heard without a jury and to make new or amended findings." Johnson, supra, at 158.
The trial court's statement that "defendant denies that the machine rang" is contrary to the record. There was no such denial; defendant professed not even to know whether he had passed through the magnetometer through which every passenger had to pass. Further, no "ringing" was involved in the operation of the magnetometer, only a light appeared to indicate the presence of metal.
The testimony indicating that for the purpose of their daily testing of the magnetometer marshals walked through *598 it wearing a pistol affords no justification for the court's assumption that the machine would not react to a lesser quantity of metal or its conclusion that the marshal testified falsely when he said the machine did light up.
Significantly, the court's findings make no reference to the fact that defendant appeared "high" and had admitted that he had injected himself with seven or eight bags of heroin some three to four hours earlier.
We find that the magnetometer did light up when defendant passed through it. Further, we are satisfied and find that the marshal, in concluding that a pat down was called for, relied not only on the information that defendant was a "selectee" who matched the profile, but also on the reaction of the magnetometer, defendant's inability to produce any identification, and his drugged appearance. Indeed, even if the reaction of the magnetometer be disregarded, the other circumstances gave rise to a reasonable suspicion mandating the action taken by the marshal. Had he not taken that action  and this whether defendant consented or not  "he would have been derelict in his duties as a marshal, charged with the responsibility of detecting potential hijackers." United States v. Bell, supra, 464 F.2d at 672.
Further, despite the rulings to the contrary in some of the cited federal cases, we do not deem it a prerequisite to a finding that the marshal's suspicions were reasonable, that it be shown that the "profile" was valid and properly applied and that the magnetometer was properly set up.
We are not here concerned with the use of evidence to convict a defendant at a trial. We are concerned only with whether the officer acted reasonably  whether the situation that confronted the officer justified the pat-down. It suffices that it appear that the marshal, in good faith, believed the "profile" information he received and had no reason to believe that the magnetometer was not operating properly.
Further, the record is contrary to the finding that the pat-down disclosed only a "small bulge, something which is *599 unremarkable in the clothing of an ordinary traveler." The finding ignores the uncontradicted testimony that the bulge, although small "felt very hard." The size of the bulge is not the controlling consideration. "* * * [T]he weapon of the skyjacker is not limited to the conventional weaponry of the bank robber or of the burglar. His arsenal may well include explosives." United States v. Bell, supra, 464 F.2d at 674; United States v. Skipwith, 482 F.2d at 1277; see also State v. Campbell, 53 N.J. 230, 238 (1969).
Once the marshal felt the bulge, he was clearly correct in proceeding to ascertain what object caused it. When his investigation revealed the narcotics and narcotic paraphernalia, he had reasonable cause to arrest defendant and, as an incident thereto, to search defendant's attache case.
Finally, we do not agree with the trial court's conclusion  based on its finding that defendant had requested "the opportunity to return his ticket and leave without boarding the plane"  that "he had a right to have his privilege respected" so that the pat-down and search which followed were illegal. Although the rule applied by the trial court has some judicial support  see United States v. Meulener, 351 F. Supp. 1284, 1289-1290 (C.D. Cal. 1972); United States v. Ruiz-Estrella, 481 F.2d 723, 728-729 (2 Cir.1973); People v. Hyde, 108 Cal. Rptr. 785 (Ct. App. 1973)  we find no justification therefor and reject it for the cogent reasons concurred in by all the members of the court in United States v. Skipwith, supra:
* * * I do not accept defendant's contention that, once he had reached the point of embarkation where inquiry and possible search procedures were openly in operation, he could choose to withdraw if he found the inquiry addressed to him not to his liking. United States v. Meulener, C.D. Cal., 1972, 351 F. Supp. 1284. The reasoning in Meulener, that if he then changed his mind, and elected to leave, "he would pose no danger to the passengers and crew on the aircraft," 351 F. Supp. at 1289, greatly damages the prophylactic purpose of the search procedure. Such an option would constitute a one-way street for the benefit of a party planning airplane mischief, since there is no guarantee that if he were allowed to leave he might *600 not return and be more successful. Of greater importance, the very fact that a safe exit is available if apprehension is threatened, would, by diminishing the risk, encourage attempts. Established search procedures are perhaps more valuable by what they discourage than by what they discover. I see no constitutional requirement, where a defendant knew by objective signs that he was incurring the possibility of a search, that he should thereafter be allowed to play heads-I-win, tails-you-lose. [482 F.2d at 1281]
The order suppressing evidence is reversed.