is directed to immediately turn over her driver's license to the clerk of this court.

607 A.2d 1381

STATE OF NEW JERSEY, v. HAROLD ASCENCIO.

Superior Court of New Jersey
Law Division (Criminal)
Union County

Decided May 8, 1992.

*Michael A. Monahan,* Assistant Prosecutor appearing for the State (*Andrew K. Ruotolo,* Prosecutor of Union County).

*Richard J. Zeitler* appearing for the defendant.

IRONSON, J.S.C.

On May 16, 1991, defendant, Harold Ascencio, unsuccessfully tried to pass through a magnetometer ("metal detector") at Newark International Airport. He was stopped by Hector Rodriguez, a supervisor with the Airport's security, when the alarm was activated. Mr. Rodriguez testified that after the alarm was activated, he asked the defendant to step aside, take all objects out of his pockets and pass through the magnetometer again. Defendant complied with that request and gave no indication that he wanted to leave. The alarm was again activated. Mr. Rodriguez then conducted a search of defendant's outer clothing with a hand held magnetometer ("wand"). During the course of that search the wand came into contact with an object under defendant's left armpit. Mr. Rodriguez noticed a bulge in the area and believed that it could have been

a gun. Mr. Rodriguez asked the defendant what the object was and received no reply from the defendant whereupon Mr. Rodriguez called the Port Authority police.

Officer Michael Rea, a Port Authority police officer for nine years, responded to a call that there was a man with a gun at the screening point. Mr. Rodriguez told Officer Rea what had happened. When Officer Rea asked defendant if he was carrying a weapon Mr. Ascencio did not respond. After Officer Rea patted down the area near defendant's left arm to confirm the existence of the object Officer Rea reached under defendant's shirt and physically removed the object. Officer Rea could not tell what the object was. Defendant, when asked what the package contained replied, "I don't know; it belongs to a friend." Officer Rea asked Mr. Ascencio if the package could contain a bomb, a gun or drugs, to which defendant did not respond. At that point, Mr. Rodriguez, who had been trained in the use of X-ray machines, put the package through the machine and detected what he believed to be the outline of a gun. Defendant was given his Miranda warnings and was brought to the police station and put in a holding cell. The package was thereupon opened and drugs, not a weapon, were found.

In contrast, the defendant testified that when the alarm was activated, he decided not to board the plane. He began to walk away from the area, but Mr. Rodriguez ordered him to go back through the magnetometer. Mr. Ascencio did so and the alarm was activated again. Rodriguez grabbed him, moving him off to the side and conducted a search of the defendant using a wand and during the course of which the wand hit a package. Officer Rea patted down the defendant and retrieved the package from underneath his shirt. Defendant was then arrested and handcuffed; the package was put through the x-ray machine, whereupon the defendant was brought to the police station.

Defendant at the motion to suppress asserted that the initial detention and questioning was an illegal search without con-

sent. He asserted that the frisk of his person was invalid as no threat to the guard existed. The defendant further contended that no search could be conducted as he had abandoned his intention of boarding the plane. Additionally, the defendant argued that the search of the package after defendant's arrest was an illegal warrantless search.

This court finds that the initial stop of the defendant was valid. In *State v. Adams*, 125 *N.J.Super* 587, 312 *A.*2d 642 (App.Div.1973) the Appellate Division held that a marshal had a duty to prevent hijackings. Had the marshal not stopped a selectee who matched the hijackers profile, who could not produce identification and who appeared to be under the influence, the marshal would have been derelict in his duties. The Court did not require all of those factors to be present, and stated "we do not deem it a prerequisite to a finding that the marshal's suspicions were reasonable, that it be shown that the 'profile' was valid and properly applied and that the magnetometer was properly set up.'" *Id.* at 598, 312 *A.*2d 642.

In the case at bar, Mr. Rodriguez testified that the magnetometer and the X-ray machines were used to detect the presence of metal and to prevent weapons and other contraband from passing through to the boarding area. When the magnetometer was set off, FAA regulations required him to ask the person to step aside, take all metal objects out of his pockets and step through again. If the alarm sounded again, the person was to be searched using a hand held magnetometer.

Similar to the marshal in *Adams*, Mr. Rodriguez had a duty to stop the defendant and to find out what caused the alarm to go off. A security officer, similar to a police officer, may in appropriate circumstances approach a person for the purpose of investigating possible criminal behavior even though there was no probable cause to arrest. *Terry v. Ohio*, 392 *U.S.* 1, 22, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906–907 (1968). In light of the danger to those in the airport and the FAA procedures, the ringing of the alarm alone gives the officer reasonable suspi-

cion to stop one who activates the magnetometer. Had Mr. Rodriguez not stopped the defendant he would have been derelict in his duties. *State v. Adams*, 125 *N.J.Super.*, *supra* at 592, 312 *A*.2d 642; *United States v. Bell*, 464 *F*.2d 667 (2 Cir.1972).[1]

■ This court finds that the frisk of the defendant was proper for two reasons. First, when a police officer has lawfully stopped a person and when that officer has reason to believe that he is dealing with an armed and dangerous individual he may conduct a limited search for weapons. The officer need not be absolutely certain that the person was armed; however, the officer must have specific reasonable inferences drawn from the facts which led the officer to believe that his safety or the safety of others was in danger. *Terry v. Ohio, supra.* Events occurring subsequent to a permissible investigatory stop may give rise to an objectively credible suspicion that the suspect is armed. *State v. Lund*, 119 *N.J.* 35, 573 *A*.2d 1376 (1990).

In the instant case the officers had reason to believe that they were dealing with an armed individual notwithstanding the fact that defendant did not make any threatening gestures towards them. The magnetometer detected the presence of metal when the defendant passed through. The defendant was asked to empty his pockets and walk though again. When the alarm was activated again, the officers did not know what set off the metal detector so the defendant was subjected to a search of his outer clothing by a hand held magnetometer. During the course of this search, Mr. Rodriguez came into contact with a hard object which he believed could have been the butt of a gun. Mr. Ascencio would not say what it was.

---

[1] See Chief Judge Friendly's concurring opinion in *Bell, supra* which rejected any implication that searches of airplane passengers are lawful only in circumstances where the passenger matches a "profile" and activates a magnetometer. See also *State v. Adams, supra* which found the concurrence in *Bell* persuasive, but stated that they did not have to adopt it based on the fact in *Adams*.

When Officer Rea responded to a radio call that there was a man with a gun near the metal detector and he asked the defendant if he was carrying a gun, defendant did not respond. Since nothing in Officer Rea's conversation with the defendant eased his suspicions that the defendant was carrying a gun, Officer Rea confirmed the existence of a hard object by conducting a patdown which was limited in scope to the left armpit area. See *United States v. Epperson*, 454 *F.*2d 769 (4th Cir.1972) which upheld a *Terry* rationale for stop and frisk searches in an airport.

This court rejects defendant's argument that *State v. Novembrino*, 105 *N.J.* 95, 519 *A.*2d 820 (1987) requires this court to afford the defendant more rights than those given in federal cases dealing with a stop and frisk situation. While the New Jersey Supreme Court has stated that "state constitutions may be a source of 'individual liberties more expansive than those conferred by the Federal Constitution'" *Id.* at 144–145, 519 *A.*2d 820, nothing in *Novembrino* overruled *State in Interest of HB*, 75 *N.J.* 243, 252, 381 *A.*2d 759 (1977) which declined to afford a defendant more rights than given by federal cases in stop and frisk situation such as this one. See *State v. Otero*, 245 *N.J.Super* 83, 584 *A.*2d 260 (App.Div.1990) where the Appellate Division held that state courts can rely on the United States Supreme Court case law regarding investigatory stops under the Fourth Amendment in assessing the reasonableness of such investigatory stops under the State Constitution. The court in *Otero* further stated that New Jersey law unquestionably permits police to "stop and frisk" an individual in the absence of probable cause to arrest.

Second, the stop and frisk of the defendant was valid based upon a theory of implied consent as defendant was clearly in an area where he knew that he could be subjected to a search. State's Exhibit # 1, entered into evidence, is a photograph of a warning sign posted at the beginning of the screening point. It states in pertinent part:

### Federal Security Inspection Rules

•    •    •    •    •    •    •    •

Passenger Screening

★ Federal regulations prohibit persons from having a firearm, explosive or incendiary device on or about their person or accessible property when entering or in an airport sterile area or while aboard an aircraft.

★ Inspection of all persons and hand-carried articles entering a security checkpoint is required.

★ Inspection may be refused. Persons refusing inspection may not proceed beyond this point.

By passing through the magnetometer, the defendant impliedly consented to the search which he could not avoid by choosing not to board the plane. In *State v. Adams, supra* 125 *N.J.Super.* at p. 599, 312 *A.*2d 642, the court rejected defendant's contentions that "once he had reached the point of embarkation where inquiry and possible search procedures were openly in operation, he could choose to withdraw if he found the inquiry addressed to him was not to his liking." quoting *United States v. Skipwith,* 482 *F.*2d 1272, 1281 (5th Cir.1973). In *United States v. Pulido–Baquerizo,* 800 *F.*2d 899, 902 (9th Cir.1986) the requirement allowing passengers to avoid a search by electing not to fly does not extend to a passenger who has already submitted his luggage for an x-ray scan. The same holds true for one who walks through a magnetometer. That person can no longer avoid the search by abandoning his intent to board the plane.

This court also finds that the officers properly opened the container at the police station. Once the officers felt a bulge, they were "clearly correct in proceeding to ascertain what object caused it." *State v. Adams,* 125 *N.J.Super., supra* at 599, 312 *A.*2d 642. This court finds *United States v. Pulido–Baquerizo, supra* persuasive where the court stated at p. 901:

... those passengers placing luggage on an x-ray machine's conveyor belt for airplane travel at a secured boarding area impliedly consent to a visual inspection and limited hand search of their luggage if the X-ray scan is inconclusive in determining whether the luggage contains weapons or other dangerous objects.

The same holds true for the package which was found in the case at bar.

Equally persuasive is the dicta in *United States v. Albarado,* 495 *F.*2d 799 (2d Cir.1974) where the court stated at p. 809:

> It might be said that inasmuch as the officer is only looking for the item which activated the magnetometer, he could not open a container, which he knew upon feel could not contain the offending metal. Generally this is so, because a passenger's activation of the magnetometer does not give the officer a license to search him generally but only for the offending metal. This is not to say, however, that an officer may never investigate something which is not metallic. Hijackers as well as airport officers know of the existence of plastic explosives or even ordinary dynamite. If an officer comes lawfully upon a container which may conceal such items, he may require that they be opened to his inspection before the passenger is allowed to proceed on board with the container. [*United States v. Kroll,* 481 *F.*2d 884, 886–887 (8th Cir.1973)]

The package in question had a brown or green wrapping, it was approximately 8½ inches long, 4 inches wide and 2 inches thick and its shape was not indicative of its contents. When Officer Rea asked the defendant if the package contained a bomb, a gun or drugs, defendant did not respond. When the package was put through an X-ray machine Mr. Rodriguez believed that he saw the outline of a weapon. The officers could reasonably believe that the package contained a weapon of some kind and therefore would have been justified in opening the package at the scene. The fact that the officers, for safety reasons chose to leave a crowded airport, and open the package at police headquarters, which was less than a mile away does not change this result. Also the fact that drugs, not a weapon was found does not require suppression of the evidence. *State v. Carter,* 235 *N.J.Super.* 232, 234, 561 *A.*2d 1196 (App.Div.1989).

Accordingly for the above stated reasons, the motion to suppress is hereby denied.[2]

---

[2]In light of this finding it is unnecessary for the court to consider the State's argument that defendant abandoned his interest in the package when he stated that the object belonged to a friend.