The STATE of Ohio, Appellant,

v.

HIGGINS, Appellee.

[Cite as *State v. Higgins,* 183 Ohio App.3d 465, 2009-Ohio-3979.]

Court of Appeals of Ohio,
Fifth District, Fairfield County.

No. 08–CA–57.

Decided Aug. 6, 2009.

David L. Landefeld, Fairfield County Prosecuting Attorney, and Gregg Marx, Assistant Prosecuting Attorney, for appellant.

Dagger, Johnston, Miller, Ogilvie & Hampton and Aaron R. Conrad, for appellee.

DELANEY, Judge.

{¶ 1} Plaintiff-appellant, the state of Ohio, appeals from the trial court's entry suppressing evidence of marijuana found on the person of appellee-defendant, Ashley Higgins, when she visited an inmate in the Southeastern Ohio Correctional Institution ("SCI"), as well as statements that appellee made to law-enforcement officers at that time.

{¶ 2} The facts giving rise to the current appeal are:

{¶ 3} Ohio State Highway Patrol Trooper Rebekka Robinson is assigned as a plainclothes investigator working at SCI. Trooper Robinson had been investigating inmate Donel Harris, who was receiving drugs from visitors at SCI. In the course of her investigation, trooper Robinson reviewed Harris's visitation records

and his recorded telephone conversations and discovered that appellee was one of two females who were visiting Harris.

{¶ 4} In August 2007, trooper Robinson monitored a phone call between Harris and appellee in which appellee mentioned "weed," which caused Harris to become upset. On August 2, 2007, Harris called appellee, and appellee mentioned "weed." In a second conversation that same day, Harris mentioned that appellee was picking "it" up. On August 5, 2007, Harris again called appellee and told her that his cell had been the target of a shakedown and that "this shit is over, never again, fuck no * * * that shit is officially over."

{¶ 5} The next contact between Harris and appellee was on December 30, 2007, when appellee visited Harris in prison. After that visit, officers were given a tip that Harris was going to have drugs brought to him in the prison. On January 11, 2008, appellee again visited Harris. The visit was monitored by video camera, but no illicit activity was observed.

{¶ 6} Appellee planned to visit Harris on January 20, 2008, and trooper Robinson was informed of her visit. Trooper Robinson observed appellee enter SCI. In order to enter the prison, appellee had to pass several signs before entering the prison. The first sign, which was clearly posted in the parking lot of the prison, stated, "NOTICE. ANY PERSON ENTERING THESE PREMISES SHALL BE SUBJECT TO SEARCH AT ANY TIME." The second sign, posted immediately outside the visitors' entrance to the prison, stated, "STATE LAW EFFECTIVE 5/23/78. Section 2921.36 O.R.C. PROHIBITS Conveying onto the grounds of a detention facility or deliver of items to inmates thereof: 1. Any deadly weapons or parts thereof, or ammunition. 2. Any drugs. 3. Any intoxicating liquors. FURTHERMORE Whoever violates above section is subject to arrest by detention authorities. PENALTY A felony or misdemeanor." A third sign, posted inside the prison, stated, "STOP. No Weapons No Cell Phones No Drugs."

{¶ 7} After appellee emptied her pockets, she was given a visitor's pass and she walked through the security door. At that time, trooper Robinson approached appellee and stated, "I'm Trooper Robinson. I need to talk to you." Appellee agreed to speak with trooper Robinson, and they walked to an interview room on the second floor of the building.

{¶ 8} Trooper Robinson informed appellee that she believed that appellee had brought marijuana to inmate Harris previously and that she knew that appellee had brought more marijuana with her on that date. Trooper Robinson then told appellee that she needed to hand the drugs over to her. Appellee moved her hand to her left bra cup and pulled out a bag containing six individual bags of marijuana and placed the larger bag on the table.

{¶ 9} Trooper Robinson testified that at that time, appellee was not in custody and that had she expressed a desire to leave, she would have been free to do so. After appellee removed the marijuana from her bra, trooper Robinson patted appellee down to ensure that appellee did not have any additional contraband on her person. Trooper Robinson then advised appellee of her Miranda rights; appellee waived those rights and wrote out a statement admitting that she had brought marijuana into the prison on one previous occasion for Harris.

{¶ 10} Appellee was indicted on March 28, 2008, on one count of illegal conveyance of drugs of abuse onto the grounds of a detention facility, a felony of the third degree, in violation of R.C. 2921.36. She filed a motion to suppress evidence and requested an oral hearing. A hearing was held, and the court sustained her motion, finding that the evidence had been illegally seized. The court, however, did state that appellee's expectation of privacy was not violated and that she was not searched within the meaning of the Fourth Amendment. The trial court also determined that trooper Robinson did not possess reasonable suspicion in which she could detain appellee for an investigatory stop.

{¶ 11} Appellant now appeals from the trial court's judgment entry and raises one assignment of error:

{¶ 12} "I. The trial court's decision granting defendant's motion to suppress evidence was an abuse of discretion."

I

{¶ 13} In its sole assignment of error, appellant, the state of Ohio, asserts that the trial court erred when it suppressed evidence resulting from the defendant's encounter with a law-enforcement officer at the prison, which resulted in the discovery of illegal drugs being transported by defendant into the prison.

{¶ 14} Appellate review of a trial court's decision to grant a motion to suppress involves a mixed question of law and fact. *State v. Long* (1998), 127 Ohio App.3d 328, 713 N.E.2d 1. During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility. *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf* (1996), 111 Ohio App.3d 142, 675 N.E.2d 1268. Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141.

{¶ 15} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583; and *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141. Second, an appellant may argue that the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Claytor* (1994), 85 Ohio App.3d 623, 620 N.E.2d 906.

{¶ 16} Appellant challenges the trial court's judgment entry on two separate grounds: first, that the trial court's findings of facts were not supported by the manifest weight of the evidence;[1] and second, that the trial court erred in making the ultimate decision on the issues raised in appellee's motion to suppress.

{¶ 17} In analyzing these claims, we must consider the purpose of the Fourth Amendment as well as R.C. 2921.36 and 5120.421.

{¶ 18} The Fourth Amendment of the Constitution of the United States guarantees each citizen a right to be free from unreasonable governmental intrusions. Specifically, it states:

{¶ 19} "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

{¶ 20} "The Fourth Amendment's prohibition against unreasonable searches and seizures has always been interpreted to prevent a search that is not limited to the particularly described 'place to be searched, and the persons or things to be seized,' U.S. Const., Amend. IV, even if the search is made pursuant to a warrant and based upon probable cause." *Florida v. Royer* (1983), 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229.

---

1. Appellant's complaint is that the trial court did not consider all the facts that appellant deems important from the hearing below. This court has considered all relevant facts in coming to its determination as to the ultimate issue in this case.

{¶ 21} The predicate for permitting seizures on suspicion short of probable cause "is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. at 500, 103 S.Ct. 1319, 75 L.Ed.2d 229, citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 881–882, 95 S.Ct. 2574, 45 L.Ed.2d 607; *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612.

{¶ 22} It is the state's burden to demonstrate that the seizure it seeks to justify was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

{¶ 23} R.C. 2921.36 states:

{¶ 24} "(A) No person shall knowingly convey, or attempt to convey, onto the grounds of a detention facility or of an institution, office building, or other place that is under the control of the department of mental health, the department of mental retardation and developmental disabilities, the department of youth services, or the department of rehabilitation and correction any of the following items:

{¶ 25} "(1) Any deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, or any part of or ammunition for use in such a deadly weapon or dangerous ordnance;

{¶ 26} "(2) Any drug of abuse, as defined in section 3719.011 of the Revised Code;

{¶ 27} "(3) Any intoxicating liquor, as defined in section 4301.01 of the Revised Code."

{¶ 28} R.C. 5120.421 states:

{¶ 29} "(B) For purposes of determining whether visitors to an institution under the control of the department of rehabilitation and correction are knowingly conveying, or attempting to convey, onto the grounds of the institution any deadly weapon, dangerous ordnance, drug of abuse, intoxicating liquor, or electronic communications device in violation of section 2921.36 of the Revised Code, the department may adopt rules, pursuant to Chapter 119. of the Revised Code, that are consistent with this section.

{¶ 30} "(C) For the purposes described in division (B) of this section, visitors who are entering or have entered an institution under the control of the

department of rehabilitation and correction may be searched by the use of a magnetometer or similar device, by a pat-down of the visitor's person that is conducted by a person of the same sex as that of the visitor, and by an examination of the contents of pockets, bags, purses, packages, and other containers proposed to be conveyed or already conveyed onto the grounds of the institution. Searches of visitors authorized by this division may be conducted without cause, but shall be conducted uniformly or by automatic random selection. Discriminatory or arbitrary selection searches of visitors are prohibited under this division."

{¶ 31} We also find to be informative, though neither appellant or appellee mention this in their briefs, Ohio Adm.Code 5120–9–15, which states:

{¶ 32} "(G) Tentatively approved visitors shall be interviewed prior to their first visit with the inmate by a person designated by the warden or designee for the purpose of verifying identification. During this interview, the visitor shall be apprised of institutional regulations, *particularly state law concerning the introduction of unlawful contraband into a correctional institution. Only after completing this interview may a person be placed on an inmate's approved visiting list.*

{¶ 33} "(H) Approved visitors may be excluded from visiting when they act in violation of established visiting rules, and/or there is a reason to believe that their presence would pose a security risk, or be disruptive to the institution or to the inmate's adjustment. Such exclusions may range from denial of visiting for that day, termination of a current visit, suspension of visiting privileges for a specified period of time or an indefinite period of time. Any denial or termination of a visit must be approved by the warden or designee. Only the warden can suspend further visits. In these cases the warden shall provide written notice to the inmate and the suspended visitor. Suspended visitors shall be afforded the opportunity to present their views concerning such suspension. Suspended visitors may be required to reapply to the warden for a reinstatement of the visiting privileges." (Emphasis added.)

{¶ 34} As demonstrated by the Ohio Administrative Code and the statutes enacted by the Ohio legislature regarding the introduction of contraband into detention facilities, in the context of jails and prisons, security and order are of utmost importance. It is well understood that it is often the practice of prisons to require visitors to submit to some type of search. The permissibility of certain law-enforcement practices, such as these penal-institution-visitor searches, is judged by balancing the intrusion on the individual's Fourth Amendment interests against the promotion of legitimate government interests. See *Delaware v. Prouse* (1979), 440 U.S. 648, 653–654, 99 S.Ct. 1391, 59 L.Ed.2d 660. Thus the question becomes whether the state's interest in keeping contraband out of penal

institutions is sufficient to warrant this intrusion and whether the search policy in question is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio* (1968), 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 35} We find that the instant search was justified when tested by both criteria from *Terry*. The government has a legitimate interest in keeping contraband out of penal institutions, and such an interest is more than sufficient to justify this search.

{¶ 36} The group of persons subject to a search in the prison is self selected. Only those who choose to go to the institution will be subject to such searches. *People v. Turnbeaugh* (1983), 116 Ill.App.3d 199, 71 Ill.Dec. 862, 451 N.E.2d 1016, citing *State v. Manghan* (1973), 126 N.J.Super. 162, 313 A.2d 225; 3 LaFave, Search and Seizure (1978) 371, Section 10.7(b). Moreover, those who choose to visit inmates at SCI pass by not one but three signs warning them that they are subject to search at any time if they continue into the institution and informing them of the penalties for doing so if they are carrying contraband.

{¶ 37} As the court in *Turnbeaugh* noted, "such notice bears upon the reasonableness of the selection process: Because the group subject to search is self-selected by their decision to enter the institution, it is important that this decision be made with knowledge of the risks attendant upon further pursuance of their chosen course of conduct and with an opportunity to leave behind anything which might be embarrassing or incriminating if discovered." Id. at 203, 71 Ill.Dec. 862, 451 N.E.2d 1016.

{¶ 38} Appellee, who was seeking to visit an inmate in the legal custody of the state, exercised a privilege to enter the institution, not a right. *Mathis v. Appellate Dept. of the Superior Court of Sacramento Cty.* (1972), 28 Cal.App.3d 1038, 105 Cal.Rptr. 126. "Prison officials may regulate the visitation of prisoners. * * * 'Consequently, prison authorities may subject inmates to intense surveillance and search unimpeded by Fourth Amendments barriers. * * * Prison officials may regulate communications and visitation. * * *' It necessarily follows that they may restrict the manner of visitation by conditioning the privilege in ways reasonably consistent with the security of the facility." Id. at 1041, 105 Cal.Rptr. 126.

{¶ 39} In *Wells v. State* (1981), 402 So.2d 402, the Florida Supreme Court affirmed the convictions of a woman who had transported contraband into a state prison. In *Wells*, the prison had received a tip that the defendant would be transporting drugs into the prison for an inmate. When Wells entered the prison, an officer asked Wells to accompany her to an office, where Wells was

instructed to remove her clothing for a strip search. A patdown search of her upper torso revealed marijuana.

{¶ 40} The court in *Wells* conceded that the officers had probable cause to search Wells but determined that the Fourth Amendment was not implicated in this case. In so reasoning, the court stated, "As a predicate to her claim that her fourth amendment rights were violated, Wells must first establish that she had a reasonable expectation of privacy to be free from the particular intrusion involved here. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d at 220 (1979); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Shapiro v. State,* 390 So.2d 344 (Fla.), cert. denied, 450 U.S. 982, 101 S.Ct. 1519, 67 L.Ed.2d 818 (1980). In determining whether she demonstrated a reasonable expectation of privacy, we are concerned not merely with what her own personal expectation of privacy was, but, more importantly, we are concerned with what expectations are constitutionally justifiable so as to implicate the fourth amendment. *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). To make this determination, we must decide whether her individual subjective expectation is one that society is prepared to recognize as reasonable under the circumstances. *Smith v. Maryland; Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Shapiro v. State.* Although the fourth amendment protects people and not places, reference to the place where the right is being asserted is essential to the application of the objective standard for determining reasonableness of the expectation of privacy. *Katz v. United States,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring)." *Wells,* 402 So.2d at 404.

{¶ 41} The court further reasoned that it is doubtful that most visitors to prisons have any subjective expectation that they will not be searched for weapons or other contraband. "It should be obvious to any reasonable person that for the protection of both the guards and the inmates, as well as any visitors, that prison personnel must do whatever is necessary to prevent the introduction of contraband into the prison. As acknowledged by the Supreme Court of the United States in *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), 'A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence.'"

{¶ 42} Assuming arguendo that the defendant did have a subjective expectation of privacy upon entering the prison, the *Wells* court further found that such an expectation is not one that society is prepared to recognize as reasonable. The United States Supreme Court, in *Lanza v. New York* (1962), 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384, stated:

{¶ 43} "(T)o say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of

his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day."

{¶ 44} The *Wells* court determined that the defendant failed to establish a reasonable expectation of privacy from the search of her person, which was conducted for the limited purpose of discovering whether she was carrying contraband into the prison. Accordingly, the court found that the Fourth Amendment was not implicated and neither probable cause nor a warrant was required as a prerequisite to the search. Id. Moreover, the court found that the manner of conducting the search was not so "patently offensive to human dignity so as to shock the conscience or offend even hardened sensibilities and thus partook of none of the abusive characteristics held to violate the due process clause." Id. at 405, citing *United States v. Robinson* (1973), 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427; *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908.

{¶ 45} Additionally, in *State v. Custodio* (1980), 62 Haw. 1, 607 P.2d 1048, the Hawai'i Supreme Court reversed a trial court's decision to suppress a balloon and the contents of that balloon, which were recovered from a defendant's body pursuant to a strip search at a prison. The Supreme Court, in reversing the trial court, held that the seizure of the balloon which the defendant voluntarily submitted to during a strip search did not constitute an unreasonable search and seizure. In making its determination, the court held that because a visitor to a prison is free to leave whenever they choose, a search of the visitor is only a "condition" of entry to the prison. "Those visitors wishing to avoid searches need only refrain from seeking admission." Id. at paragraph four of the syllabus.

{¶ 46} In *Custodio,* the facts adduced showed that the defendant passed a sign at the prison gates informing all visitors that they would be subject to search upon entry to the prison. After entering the prison, the defendant went through routine procedures, such as registering and checking her personal belongings with prison officials. After completing those procedures, the defendant was led into a separate room by an officer and asked to submit to a strip search. When the defendant removed her undergarments, the officer noticed white fuzz between the defendant's legs in the vaginal area. When questioned about the

nature of the fuzz, the defendant responded that it was "nothing." The officer asked the defendant to remove the article and the defendant herself pulled the object out and handed it to the officer. The object recovered was a multicolored balloon. The officer then called the front-gate guard who alerted the police department. On arrival of the police, the defendant was questioned and the balloon seized. The defendant was charged with promoting detrimental drugs in violation of Hawai'i state law. The balloon was taken to the police department's narcotics division and on analysis of its contents was found to contain .5 grams of marijuana.

{¶ 47} The court, in upholding the validity of the search, stated that the sign indicating that all visitors would be subjected to a search was posted at the front gate to the prison, and it was reasonable to assume that the defendant was or should have been aware that it was prison policy to condition entry on submission to a search. The court further found that the search was not carried out in an oppressive or discriminatory manner. "At no time during the search was any force used," nor did the officer assist the defendant in removing either her clothes or the balloon. Id. The defendant "was a visitor to the prison, free to leave whenever she so chose. Search of her person and production of the balloon was only a condition of entry to the prison. To avoid the search [defendant] need only have refrained from seeking admission. Thus, unlike in [State v. Kaluna, (1974), 55 Hawaii 361, 520 P.2d 51], the search of appellee was conducted with her full knowledge and freely given consent." Id. at 6, 607 P.2d 1048.

{¶ 48} As the Custodio court noted, "Prison security and maintenance are compelling governmental interests justifying restrictions on visitation. As recent as this past term, the United States Supreme Court in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) upheld the reasonableness of visual body cavity inspections conducted on prisoners after every contact visit. In making its determination, the Court balanced four factors: the scope of the intrusion, the manner in which it was conducted, the justification for initiating it, and the place in which it was conducted. Id. 441 U.S. 520, 99 S.Ct. at 1884, 60 L.Ed.2d 447. Following these guidelines, we conclude that the search of the balloon's contents was in accord with reasonable procedures. The manner in which it was conducted was not unduly harsh or oppressive and the need to preserve prison security and prevent the promotion of detrimental drugs are dominant concerns. Given appellee's diminished expectation of privacy in the balloon once it had been properly recovered, coupled with the compelling state interests in internal order and discipline in prison, this court finds the search within constitutional limits." 62 Haw. at 8, 607 P.2d 1048.

{¶ 49} Finally, in State v. Manghan (1973), 126 N.J.Super. 162, 313 A.2d 225, the New Jersey Superior Court denied a defendant's motion to suppress on the basis that evidence was illegally seized during a prison visit search.

{¶ 50} In *Manghan*, the defendant walked through a gate into the visitors' section of the Bergen County jail to visit a woman alleged to be his wife. The gate was the only gate visitors were allowed to enter through, and above this gate was a sign that stated, "Stop. You are subject to be searched while on these premises." Upon entering the premises, the defendant signed the visitors' book, as he had done in the past.

{¶ 51} Based on a tip received from a confidential informant that the defendant had been bringing drugs at visiting hours to his wife, who was incarcerated, an officer of the Bergen County Sheriff's Department apprehended the defendant upon his entry to the jail and ordered two other officers to escort him into another room and search him. Though the defendant did not physically resist, when informed that he was going to be searched, he stated that he no longer wished to visit and would come back another day. He was not allowed to leave, and a search of his person revealed an aluminum foil packet in his right sock that contained a white powdered substance, later field tested and found to be heroin.

{¶ 52} The court, in upholding the validity of the search, stated, "It is vital that contraband articles be kept out of a prison. This is necessary for the protection of the inmates, employees of the institution and law enforcement officials assigned to that institution. There is also a duty toward society which dictates that articles must be kept from a penal institution that would facilitate escape from such institutions." *Manghan*, 126 N.J.Super. at 166, 313 A.2d 225.

{¶ 53} The court continued, "The State not only has the right, but an obligation, to adopt laws which promote and insure the safety, health and morals of the inmates. It is not necessary to expound on the evils of drugs. However, the perils of the availability of drugs in a penal institution cannot be exaggerated. The ultimate purpose of a penal institution is rehabilitation. Such an institution has a duty to adopt reasonable procedures to insure that drugs are not available to inmates. The Legislature of New Jersey feels so strongly about this issue that it has enacted N.J.S.A. 2A:104–12 imposing a panalty [sic] upon one who attempts to take contraband into such institutions. Defendant is charged with a violation of this statute. This imposes a penalty in addition to the charge of possession of such contraband. Certainly, the Legislature feels this an exceptional situation. Therefore, in order to enforce this statute, it was not unreasonable for the prison officials to conduct a search, as in the instant case, of defendant's person. This is especially true in view of the fact that a sign was posted informing the public that they were subject to such a search." Id. at 227.

{¶ 54} The court in *Manghan* compared prison searches to those carried out at borders and airports. "As in the issue before the court, these are situations where it is extremely necessary to detect and confiscate contraband. There are exceptional instances where warrantless searches are authorized. *United States*

*v. Skipwith,* 482 F.2d 1272 (5 Cir.1973); *United States v. Thompson,* 475 F.2d 1359 (5 Cir.1973); *United States v. Espinoza,* 338 F.Supp. 1304 (S.D.Cal.1972). These cases also hold that such warrantless searches may be conducted on 'mere suspicion' of criminal activity in the absence of probable cause or when it is negligible." Id. at 167, 313 A.2d 225. Though the court determined that probable cause existed in the *Manghan* case, it also intimated that such searches on the basis of a "mere suspicion" would also be acceptable. Id.

{¶ 55} There is a substantial interest, as demonstrated by the courts in *Custodio, Manghan, Turnbeaugh, Mathis,* and *Wells,* in keeping contraband out of a penal institution.

{¶ 56} Defendants who find themselves in the predicament of appellee need only not enter the prison premises to avoid the possibility of being searched. A person walking by the prison, even if he appears suspicious, would not be subject to such a search. Multiple signs were posted informing appellee that she would be subject to search upon entering the prison. A sign was posted informing her that bringing contraband into the prison would result in a felony or misdemeanor charge.

{¶ 57} Given that the officers were aware of conversations between appellee and Harris concerning "weed," that they had received a tip that inmate Harris would be receiving drugs soon, and that the prison has a substantial interest in keeping drugs out of prisons for their own safety, as well as the safety of inmates and visitors, it necessarily follows that penal institutions such as SCI should be allowed to restrict the manner of visitation by conditioning the privilege in ways reasonably consistent with securing the facility.

{¶ 58} Moreover, the nature of the interaction between appellee and trooper Robinson was the most benign type of interaction that could have taken place. The manner in which the interview was conducted was not harsh or oppressive. Appellee was not even searched but voluntarily surrendered the drugs upon request of the trooper. Given the severely diminished expectation of privacy by appellee upon entering the prison, coupled with the compelling state interests in internal order and safety in the prison, we find the seizure of appellee to be clearly within constitutional limits.

{¶ 59} For the foregoing reasons, we reverse the decision of the Fairfield County Court of Common Pleas and remand for proceedings not inconsistent with this court's opinion.

Judgment reversed
and cause remanded.

WISE, P.J., and EDWARDS, J., concur.

W**ISE**, Presiding Judge, concurring.

{¶ 60} I concur with the decision of the majority reversing the trial court's grant of appellee's motion to suppress. I write separately only to caution that although there is a clear interest in preventing contraband from entering jails and prisons, and that the state's authority to search or seize visitors at a penal institution is broad, such authority is not absolute, even where warning signage is posted. For example, constitutional challenges may be cognizable based on discriminatory-profiling or improper-randomness standards. Thus, each Fourth Amendment claim in this arena must remain subject to a case-by-case review, as has been duly accomplished herein.